Herbert **ROBERTS, Joan Roberts and Lewis Bromberg, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Misc. No. M 9–150 (RWS).**

United States District Court, S.D. New York.

March 13, 1987.

Laufer & Farkash, New York City (Jacob Laufer, Leopold Laufer, Patricia M. Karish, of counsel), for plaintiffs.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City (Baruch Weiss, Asst. U.S. Atty., of counsel), for defendant.

SWEET, District Judge.

This is an application pursuant to Fed.R. Crim.P. 41(e) for the court to unseal an affidavit issued in support of a search warrant and to order the return of documents illegally seized pursuant to the warrant. The motion has been made prior to any indictment. For the reasons set forth below, the application for the return of the documents is granted.

**Facts**

On May 27, 1986 a team of Postal Inspectors executed a search warrant at 31 East 31st Street, New York, New York. Issued by a federal magistrate, the warrant identified the target of the search as the "Business Premises of Transnational Supply Warehouse, Inc., dba 'National Supply Warehouse.'" ("Transnational") According to movants, the postal inspectors searched "any and all business records on the premises," including records of entities and individuals whose names do not appear on the warrant. Whether the agents in fact searched or seized *every* scrap of paper on the premises, they searched a great many. The index to the search is 73 pages long (though many pages list only an item or two), and the government represented at the hearing on the present motion that so many papers were taken that it was physically impossible for the inspectors to examine individually every single document that they seized. The warrant authorized the seizure of:

> Customer Files, Customer Lists, Lead Source Material, Invoices, Purchase Orders, Order Forms, Lead Cards, Sales Pitch Sheets, Price Lists, Cassettes Containing Sales Pitches, Personnel Files, Employment and Payroll Records, Financial Records, Ledgers, Cash Disbursements and Cash Receipts Journals and Ledgers, Banking Records Including Cancelled Checks, Telephone Records, Correspondence, Mail and Telegram Records, Shipping Records, United Parcel Records, Sales Literature, Contracts,

Tape Recordings, Calendars and Diaries, Computer Hardware and Software, Magnetic Media, Floppy Discs, Computer Printouts, Premium Records, Bank Money Order Records, Customer Copy of Bank Money Orders, Premiums in the form of Merchandise, Gift Certificate Records, Cashiers Checks, and other records, evidence and instrumentalities of the crimes of mail fraud, wire fraud, commercial bribery and kickbacks.

There is no restriction in the warrant on whose documents were subject to seizure, no restriction as to the time period from which the documents must be, and no restriction in terms of any specific transaction to which the documents must be connected. Quite the contrary, at argument the Assistant United States Attorney represented that he could not think of a single office record not covered by the warrant. The affidavit upon whose strength the warrant was issued is sealed.

Herbert Roberts is the president of Statewide Funding Service Co., d/b/a Statewide Office Supply. Lewis Bromberg is the secretary and vice-president of the same organization. Joan Roberts is the president and sole shareholder of M.I.S.S., Inc. All three have asserted that their companies did business in a storefront at 31 East 31st Street, and that in executing the warrant on May 27, the postal inspectors seized both personal documents and documents of their businesses in violation of the Fourth Amendment. Pursuant to Rue 41(e) of the Federal Rules of Criminal Procedure, they have asked that the affidavit underlying the warrant be unsealed and/or that their wrongfully seized property be returned to them. Rule 41(e) provides that if the court returns property, the property is automatically excluded as evidence at any future trial or hearing. Thus the movants' Rule 41 application is also a motion to suppress evidence.

Movants have alleged that the inspectors seized items outside the scope of the warrant, that the warrant did not sufficiently particularize the place to be searched, and that the warrant listed so many objects of a search that the warrant was, in effect, an illegal general warrant.

The government opposes the motion primarily on the grounds that the issue is not ripe for disposition because no indictments have been voted, but it has also briefed the merits.

On October 9, 1986, the motion was argued in Part I of this court. By Memorandum Opinion of October 31, 1986, the court unsealed the affidavit for the limited purpose of *in camera* examination by the court, and directed the Assistant United States Attorney to deliver a copy of the affidavit to chambers, which was done on November 17, 1986.

### Ripeness of the Rule 41(e) Application

The text of Rule 41(e) provides:

A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized for the return of the property on the ground that he is entitled to lawful possession of the property which was illegally seized. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored and it shall not be admissible in evidence at any hearing or trial. If a motion for return of property is made or comes on for hearing in the district of trial after an indictment or information is filed, it shall be treated also as a motion to suppress under Rule 12.

Fed.R.Crim.P. 41(e) (1986).

Rule 41(e) thus provides for the piecemeal litigation of issues which attend the initiation of a criminal prosecution. An aggrieved party enjoys a choice under the terms of Rule 41(e) as to when to litigate an alleged illegal seizure: pre-indictment in the district of seizure, or post-indictment in the district of trial (in which case the application is treated as a Rule 12 motion to suppress). There has been no indictment yet in this case, and the property was seized within the Southern District.

In addressing Rule 41(e) exclusion applications over the years, courts have enumerated a number of policy considerations which militate against exclusion of evidence at the pre-indictment stage. Before

an indictment, the court is working with information which is much more rudimentary than that which will be available at a later point in the investigation/prosecution. In general, pre-indictment Rule 41(e) motions are litigated through affidavits, *DiBella v. United States*, 369 U.S. 121, 129 n. 9, 82 S.Ct. 654, 659 n. 9, 7 L.Ed.2d 614 (1962), and in keeping with general practice, parties to this action proceeded by affidavit. Even in a preindictment Rule 41 application in which there has been a full evidentiary hearing, the court's grasp of the factual context of the events is skeletal compared to the detail with which the court must master the case in its later stages. As the Supreme Court has noted, the legality of a search "too often cannot truly be determined until the evidence at trial has brought all the circumstances to light." *Id.* at 129, 82 S.Ct. at 659. Thus on a summary hearing of a Rule 41(e) application, "the ruling ... is likely always to be tentative," *id.* at 132, 82 S.Ct. at 661, and "ordinarily the District Courts will wish to reserve final ruling until the criminal trial," *id.* at 130 n. 9, 82 S.Ct. at 659 n. 9. As one of the objects of the criminal rules "is to have all pretrial motions disposed of in a single court appearance rather than to have a series of pretrial motions made on different dates," Fed.R.Crim.P. 41 (1986) (Commentary to 1972 Amendments), some courts, as a prudential matter, have deferred the Rule 41(e) determination to the court that will try the case. *See e.g., In re Grand Jury Proceedings Involving Berkley & Co.*, 466 F.Supp. 863, 866 (D.Minn. 1979). In doing so, the courts have also noted that this course reduces the potential for disrupting grand jury proceedings. *See In re Sentinel Government Securities*, 530 F.Supp. 793, 795–96 (S.D.N.Y.1982); *In re Grand Jury Proceedings Involving Berkley & Co.*, 466 F.Supp. 863, 866–67 (D.Minn.1979).

To serve these judicially recognized interests, some district courts have required movants to show "irreparable harm" before a pre-indictment Rule 41(e) application will be granted. *See, e.g., In re Sentinel Gov't Sec.*, 530 F.Supp. 793, 746 (S.D.N.Y. 1982) (Haight, J.); *In re Grand Jury Pro-*

*ceedings Involving Berkley & Co.*, 466 F.Supp. 863, 866 (D.Minn.1979). *See also Standard Drywall v. United States*, 668 F.2d 156, 157 (2d Cir.), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982) (describing district court's standard but not passing on it). To one court using this standard, the irreparable harm requirement meant that "consideration of the target's Fourth Amendment claims must be deferred to a motion to suppress evidence under Rule 12, 'in the absence of seizure of some unique property or privileged documents' ..." *In re Sentinel Govt. Sec.*, 530 F.Supp. at 797 (Haight, J.) (quoting *Standard Drywall, Inc. v. United States*, 668 F.2d 156, 157 n. 2 (2d Cir.), *cert. denied*, 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1982) (dicta)). Following Second Circuit *dicta* in *Standard Drywall*, 668 F.2d at 157 n. 2, the *Sentinel* court reasoned that the modern miracle of photocopying prevents there from being irreparable injury when the objects of the contested seizure are non-privileged documents; the government can duplicate the documents so that it can have copies to proceed in its investigation and the aggrieved party can have copies to continue to conduct its business. *Sentinal Gov't Sec.*, 530 F.Supp. at 795.

Since these cases, however, the Supreme Court has spoken plainly on the subject of court's carving exceptions out of the Federal Rules. In discussing judicial modifications that some Circuits had imposed on Fed.R.Civ.P. 15(c), the Court wrote: "We do not have before us a choice between a 'liberal' approach toward [the Rule], on the one hand, and a 'technical' interpretation of the Rule, on the other hand. The choice, instead, is between recognizing or ignoring what the Rule provides in plain language. We accept the Rule as meaning what it says." *Schiavone v. Fortune*, — U.S. —, 106 S.Ct. 2379, 2385, 91 L.Ed.2d 18 (1986). If true in the civil domain, this principle must surely be true in the criminal as well, in which the general rule is strict construction against the government.

▮ Here the Rule says nothing about delaying decisions for prudential considerations, and nothing about irreparable harm.

Rule 41(e) plainly provides for pre-indictment adjudication of the legality of a seizure, and, whether or not this is sound policy of judicial administration, it is not the court's place to "ignor[e] what the Rule provides in plain language." *Id.* Accepting the Rule as "meaning what it says," *id.,* this is indeed the proper time to pass on the legality of the search.

### Rule 41(e)'s Remedy

The government argues that even if the warrant is illegal, the agents' reliance on it falls well within the good faith standard announced in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), and that, therefore, the evidence at issue should not be suppressed. In making this argument, the government has confused the "judicially implied" constitutional remedy available under the Fourth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 648, 81 S.Ct. 1684, 1687–88, 6 L.Ed.2d 1081 (1961), with the explicit textual remedy available under Rule 41(e). The two are distinct, and this case concerns the latter.

By now it is well established that a violation of the Fourth Amendment is analytically and legally distinct from the award of any remedy for the violation. *Leon,* 468 U.S. at 905–06, 104 S.Ct. at 3411–12. Gone are the days when it was thought that the exclusionary rule was "a necessary corollary of the Fourth Amendment." *Id.* Today it is understood that, "Whether the exclusionary sanction is appropriately imposed in a particular case ... is 'an issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" *Id.* at 906, 104 S.Ct. at 3412 (quoting *Illinois v. Gates,* 462 U.S. 213, 223, 103 S.Ct. 2317, 2324, 76 L.Ed.2d 527 (1983)).

█ The "good faith" exception set out in *Leon,* and urged on the court here by the Assistant United States Attorney, is a judicially crafted qualification of a judicially fashioned remedy. In contrast, this case concerns a remedy for illegal searches that

was explicitly codified in Rule 41(e) and was left intact by Congress when it later modified another portion of Rule 41. *See* Fed.R.Crim.P. 41 ("Congressional modification of proposed [1977] Amendment"). That is, in applying Rule 41(e), a court is *not* making a Fourth Amendment exclusion decision; it is applying a procedural remedy dictated by the Federal Rules.

To apply Rule 41(e), courts must determine whether: "(1) the person is entitled to lawful possession *and* (2) the seizure was illegal." Fed.R.Crim.P. 41 (Commentary to 1972 Amendment) (emphasis in original). The first of the two criteria was provided so that "the judge in the district of seizure does not have to decide the legality of the seizure in cases involving contraband which, even if seized illegally, is not to be returned." *Id.* It is a criterion beyond that required in a Fourth Amendment suppression motion brought under Fed.R. Crim.P. 12(b)(3). If the goods in question are not contraband—and here the government has made no such claim—then the court proceeds to determine whether the seizure was legal. A seizure in violation of the Fourth Amendment certainly counts as an "illegal" search under the Rule. If both of these criteria are met, then the Rule's remedial procedures are triggered: "the property shall be restored and it shall not be admissible in evidence at any hearing or trial." (emphasis added)

Unquestionably, the remedy that Rule 41(e) provides is more stringent than required by the Constitution as construed in *Leon,* just as other of the Federal Criminal Rules are likewise more exacting than the Constitution demands. Rule 16, for instance, provides for more discovery by the defense than is dictated by *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, and failure to comply with the Rule can similarly result in the exclusion of evidence, Fed.R.Crim.P. 16(d)(2). Similarly, Fed.R.Crim.P. 32(c)(3) establishes more exacting standards with regard to the imposition of sentences than does due process. *Compare United States v. Inmon,* 594 F.2d 352, 354 (3d Cir.) ("Enunciating reasons for a sentence has

never been held to be a constitutional requirement."), *cert. denied,* 444 U.S. 859, 100 S.Ct. 121, 62 L.Ed.2d 79 (1979) *with* Fed.R.Crim.P. 32(c)(3)(D)(i) (court must make factual findings concerning alleged factual inaccuracies in PSI's). Thus Rule 41(e) is but one of many rules which establish stricter criteria and more extensive remedies than the Constitution requires.

The government has offered no authority to require this court to create a good faith exception out of the explicit language chosen by the drafters of Rule 41(e). In an earlier version, Rule 41(e) contained not only specific language about remedies, but also a detailed list of substantive criteria, *see* Fed.R.Crim.P. 41 (Commentary to 1972 Amendment), which did not reflect the full substance of search and seizure law, *see United States v. Howard,* 138 F.Supp. 376, 380 (D.Md. 1956) ("I do not understand that [Rule 41(e) ] embodies in itself *the whole* of the law of search and seizure") (emphasis in original) (cited in commentary to 1972 Amendment). The 1972 Amendment to the Rule replaced the list of substantive criteria with the phrase "illegally seized," a standard which accommodates evolution in the substantive law. But even as they provided for the evolution of the substantive law, the Rule's crafters left intact the precise, mandatory remedial language.

As Professor Wayne LaFave wrote almost ten years ago, "For over half a century now, the validity and efficacy of the Fourth Amendment exclusionary rule have been vigorously debated...." *Search and Seizure: A Treatise on the Fourth Amendment* 20 (1978); *see e.g., Bivens v. Six Unknown Agents,* 403 U.S. 388, 411–424, 91 S.Ct. 1999, 2012–19, 29 L.Ed.2d 619 (1971) (Burger, C.J., dissenting). Recent history has proven that the constitutional remedy of exclusion for violations of the Fourth, Fifth or Sixth Amendments is—in terms of the normally slow moving world of constitutional law—extraordinarily doctrinally fluid. *See, e.g., United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (good faith exception to exclusion remedy); *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (inevitable discovery exception to ex-

clusion remedy); *Kastigar v. United States,* 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (independent source exception to exclusion remedy). Since 1972, Rule 41 has been amended twice, in 1977 and 1979, and on one of those occasions Congress intervened to changed the promulgator's proposals. Considering the continuing heated debate over the exclusionary rule, Rule 41's explicit remedial command must be regarded as a policy decision; the promulgators knew how to leave terms elastic when they wished to. *See, e.g.,* Fed.R.Crim.P. 41(e) (commentary to 1972 Amendment) (allowing substantive evolution); Fed.R.Crim.P. 12(b)(3) ("Motions to suppress evidence") (elaborating neither substantive nor remedial standards).

■ Although courts should not construe the Criminal Rules "to have an inflexible meaning irrespective of the circumstances," *Fallen v. United States,* 378 U.S. 139, 142, 84 S.Ct. 1689, 1691, 12 L.Ed.2d 760 (1964), or "ritualistically," C. Wright, 1 *Federal Practice and Procedure* § 32, at 27 (1982), the circumstances surrounding Rule 41(e) show that those promulgating it weighed the alternatives and codified their conclusion. To "accept the Rule as meaning what it says," *Schiavone,* 106 S.Ct. at 2385, means that if the seizure of documents is illegal, the evidence must be returned and suppressed.

### The Particularity of the Warrant

There is simply no issue here about the extraordinary breadth of this warrant. At argument, the Assistant United States Attorney represented that he could not think of a single office record *not* encompassed by the warrant. As already noted, the index of items seized runs 73 pages, including entries such as "misc. folders." By listing every type of record that could conceivably be found in an office, the warrant effectively authorized the inspectors to cart away anything that they could find on the premises.

Apparently even the agents executing the warrant were astonished by its facial breadth. Postal Inspector Ramon Montero

called his superior to ask whether the warrant was meant to cover documents marked "Statewide" as well as those marked "National/Transnational." Inspector Montero was right to be chary; lacking any phrase limiting the target documents to any particular company, the warrant was so broad as to authorize the seizure of *anyone's* customer files, *anyone's* cancelled checks, *anyone's* financial records, and so on, as long as they were found on the named premises. It appears that Montero could not believe what he was reading, and called headquarters to check.

Despite the fact that the warrant authorized the seizure of any company's documents, including Statewide's, Inspector Montero was told by the inspector he contacted *not* to seize Statewide documents unless, in Montero's words, "they were so commingled with National/Transnational documents as to render it impossible, as a practical matter to segregate them." The reason for this commingling caveat is readily apparent: at argument the Assistant United States Attorney represented that so many documents were seized that it was physically impossible to go through every piece of paper as they were being taken.

Petitioners argue that through listing everything that might possibly be found in an office of the eighties—including, incidentally, even computer hardware, software, and floppy discs—the government has created a *de facto* general warrant. *See generally United States v. Abrams*, 615 F.2d 541 (1st Cir.1980); *United States v. Roche*, 614 F.2d 6 (1st Cir.1980); *In re Lafayette Academy*, 610 F.2d 1 (1st Cir. 1979). With no limit as to the owners of the documents, *see National City Trading Corp. v. United States*, 635 F.2d 1020, 1021 (2d Cir.1980) (warrant limited to "property of National City Trading Corp. and persons associated with it"), no limit as to the dates of the documents to be seized, *see United States v. Abrams*, 615 F.2d 541 (1st Cir. 1980) (failure to restrict dates of target documents), and no restriction to any specific wrongful transaction to which the documents were related, *see Andresen v. Maryland*, 427 U.S. 463, 480–81, 96 S.Ct. 2737,

2748–49, 49 L.Ed.2d 627 (1976) (warrant calls only for evidence respecting single fraudulent transaction), the warrant in this case authorized "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971) (quoted in *Andresen*, 427 U.S. at 480, 96 S.Ct. at 2748). Common sense shows just how broad this warrant was, as does, of course, the government's concession at argument that there is not a single record which the warrant fails to reach.

■ As a consequence of its breadth, the warrant violated the cardinal rule of Fourth Amendment law that "[a]s to what is to be taken, nothing is to be left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927) (quoted in *Andresen*, 427 U.S. at 480, 96 S.Ct. at 2748). Here, the warrant left much to the Inspectors' discretion, and—as shown by their own affidavits—they exercised it; they decided to take only as many of Statewide's documents as it was physically convenient to do so (those commingled with National/Transnational papers), but no more.

All this notwithstanding, the government has cited a Second Circuit case that stands for the proposition that when a business is "permeated with fraud" virtually all of its business records can be seized. *National City Trading Corp. v. United States*, 635 F.2d 1020, 1026 (2d Cir.1980). In deciding *National City*, the Second Circuit cited and relied upon the First Circuit's decision in *United States v. Brien*, 617 F.2d 299, 309 (1st Cir.), *cert. denied sub. nom. Labus v. United States*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980), which held "where there is probable cause to find that there exists a pervasive scheme to defraud, all the business records of an enterprise may be seized, if they are ... accurately described so that the executing officers have no need to exercise their own judgment as to what should be seized." The basic theory at work is that the notion of particularity is closely linked to the extent of the showing of probable cause; if there is

probable cause to believe that *everything* in an office is fraudulent then there is just reason "to cart away all documents." *Lafayette Academy*, 610 F.2d at 5. The issue, then, is what set of facts establishes that an organization is "permeated with fraud" in the *National City Trading Corp.* sense.

In *National City Trading Corp.*, 635 F.2d 1020, 1021–22 (2d Cir.1980), the affidavit underlying the warrant described a scheme in which every transaction was fraudulent. Although customers were being sold what they thought were commodity options, the scheme depended on their never being able to realize any benefit of their bargain. From the telephone sales pitches, to the fraudulent "purchase confirmation slip" sent to each customer after the telephone sale, to the Mailgrams demanding uncalled for payments, to the final deceptions that prevented the few customers who persisted to so late a stage from tendering full purchase price to take delivery of the commodities, the National City Trading racket was nothing but a swindle from beginning to end. Every step of each transaction was a crucial step in the fraud, and it does not appear that National City Trading conducted even a wit of legitimate business. The swearing officer had himself investigated twenty of the forty or so complaints received from the company's customers, and on at least three separate occasions undercover government agents accompanied victims to negotiations with the company. Each time the company continued to try to defraud the victim.

In *United States v. Brien*, 617 F.2d at 299, fraud likewise was the enterprise's only business. The offending organization was Lloyd, Carr & Co ("Lloyd, Carr") which, like National City Trading, sold commodity options through telephone sales. Every sale was made by telephone, with the seller working from a script of misrepresentations. *Id.* at 303. These oral misrepresentations were followed up by deceptive mailings, and by more calls and more misrepresentations. *Id.* at 303–04. Each transaction, therefore, was a cheat from its initiation to its consumation, which the affidavits underpinning the warrant described

in detail. One affiant based his description of the racket not only on an analysis of seventy-five customer complaints, but on interviews with twenty former employees, each intimate with the workings of ·the scam. The affidavit had also seen copies of the telephone scripts, and the fraudulent sales literature and confirmations mailed to customers.

 In sum, in both *National Trading Corp.* and *Brien* the target enterprises conducted no legitimate activities at all, and every action they took at every stage was designed only to further their fraudulent objectives. In this case, the affidavit is still under seal, but the court has examined it for the purpose of this application. Although the affidavit indeed establishes probable cause to believe that a number of offenses may have been committed, it does not establish probable cause that every aspect of the enterprise described was so "permeated with fraud," *National Trading Corp.*, 635 F.2d at 1026, as to allow the government "to cart away all documents." *Lafayette Academy*, 610 F.2d at 5. Because the affidavit is still under seal, the reasons for this conclusion will be filed in a supplementary opinion, which will be sealed for review by the Court of Appeals.

### Inevitable Discovery Doctrine

 Finally, the government argues that granting the illegality of the search, many of the documents illegally seized were also called for in a Grand Jury Subpoena issued to Transnational, and, consequently, the seized papers should fall within the "inevitable discovery" doctrine of *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). Like the good faith exception, however, the inevitable discovery doctrine is a judicially crafted exception to a judicially crafted remedy for violations of constitutional rights. *See Nix*, 467 U.S. at 441–44, 104 S.Ct. at 2507–509. As already discussed, this case concerns the application of the explicit remedy dictated by a federal rule when certain circumstances trigger it, and thus the exception is not apt.

## Particularity as to Place

 The offices in question here were all on the first floor of the 13–floor building at 31 East 31 Street. Because the ceilings of the building are high, a loft had been built within the offices. The movants here have argued that this loft falls outside the scope of the warrant because it is not part of the "first floor." The warrant identifies the office space as being on the first floor of the apartment building as a whole, and both work floor of the offices and the loft at issue are on the first floor of the building. Consequently, the warrant adequately identifies the place that was searched.

## Conclusion

For the reasons set forth above as well as in the sealed supplemental opinion, the seizure pursuant to this warrant was illegal under the terms of Rule 41(e). Probable cause does not exist to seize the items in the extensive list in the warrant, given that the all-inclusive list was not otherwise limited by reference in the warrant to a particular entity, to a particular time frame, or by reference to a particular fraudulent transaction. Like the colonial writs of assistance that inspired the restrictions in the Fourth Amendment, this warrant endowed the government agents with the power to exercise untamed discretion, and, in fact, they exercised it. The mandatory remedial language of Rule 41(e) commands that the property for which the affidavit does not establish probable cause must be returned.

Consequently, the government is directed to return to movants the property and documents they seek, except for the following, for which the affidavit does establish probable cause and, hence, which were not seized "illegally:"

1) Material dated between September 19, 1983 and October 26, 1983, relating to National's transaction with George Rice & Sons, or to payments made to Shirley Fong;

2) Material dated in May, 1984 relating to transactions with Harbor Federal Savings and Loan, assn., or to payments made to Sally Travis.

The direction to return the seized property is stayed for thirty (30) days to permit the government to seek review of this order should it desire to do so. When the thirty days expire, parties are directed to submit proposed orders on notice.

IT IS SO ORDERED.