**In re MOTION FOR RETURN OF PROPERTY PURSUANT TO RULE 41, FEDERAL RULES OF CRIMINAL PROCEDURE.**

Civ. No. 88–00076.

United States District Court,
D. Hawaii.

Feb. 26, 1988.

Hart & Wolff Brook Hart, Peter C. Wolff, Jr., Honolulu, Hawaii, John R. Wing Weil, Gotshal & Manges, New York City, for plaintiff.

Daniel Bent, Leslie Osborne, Jr., Robert C. Godbey, Asst. U.S. Attys., Honolulu, Hawaii, for defendant.

## MEMORANDUM DECISION AND ORDER THEREON

RAFEEDIE, District Judge, Sitting by Designation.

This matter came before the Court on the motion of William D. Mett and Center Art Galleries-Hawaii's ("CAG") for the return of property and for suppression of property from evidence, pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure.

### FACTUAL BACKGROUND

On April 15, 1987, law enforcement officers, acting under the leadership of postal inspectors from the United States Postal Service, executed six warrants simultaneously on six separate CAG locations. The execution of the warrants involved 30 law enforcement officers, searches lasting from 12 to 14 hours, and the seizure of five truckloads of items (a 322 page inventory has been submitted). The warrants were based upon Postal Inspector Richard Portmann's 34 page affidavit. After the warrants were issued, a four hour task force meeting was held in which all the executing officers were briefed on the scope of the warrants. The officers were provided with written instructions as to how the search should be executed. At each site, the officer in charge was provided with a copy of the underlying affidavit, however, the affidavit was not incorporated into the warrant.

Center Art Galleries-Hawaii was incorporated in 1974 by William D. Mett (president, and until the late 70's, the sole owner of the company). It is allegedly one of the world's largest fine arts galleries. The company's business involves the acquisition of art from artists and art dealers throughout the world and the offering of this artwork to the public through seven galleries owned by CAG in Hawaii. CAG has served over 40,000 clients internationally and has 150 employees.

The affidavit of Postal Inspector Richard Portmann specifies 22 instances of fraudulent sales to specific customers spanning the period from October of 1977 to July 1986. Each of the instances of fraud concerned Salvador Dali artworks. Fraudulent misrepresentations were allegedly made to customers concerning the value of the art. The affidavit states that the fraud includes pieces of art known as "Lincoln in DaliVision," "Retrospective," "The Last Supper (Bas-Relief)," "The Three Graces of Hawaii (Lithograph)," "The Three Graces of Hawaii (sculpture)," "Three Graces of Cove d'Or," "Sacrament of the Last Supper," "The Battle of Tetuan," "The Ascent of Gala," "Courtyard of a Spanish Palace," "Snails and Cycles," "Christ of St. John of the Cross," "Madonna of Port Lligat," "Corpus Hypercubious," and others. All of these are works of Salvador Dali. While these pieces sold for prices ranging from $900.00 to $36,500.00, they were valued by independent experts as actually being worth only $75.00 to $200.00 each.

The affidavit also cites instances where disgruntled investors were refunded their

money only after they agreed not to report the incident. In one case, an investor who made a claim with the Office of Consumer Protection was required to write a letter indicating that she was happy with CAG's services. The affidavit indicates the participation of numerous salesmen and senior salesmen and gallery managers in the alleged scheme. The Vice-President signed certificates of authenticity concerning Dali artwork which experts have indicated are false. Moreover, President Mett has been represented (in CAG brochures) as being intimately involved in the day-to-day operation of the galleries and "truly one of the greatest Dali art experts in the world ..."

The six search warrants are identical except for the different addresses of the six CAG locations. The warrants authorize a search and seizure of the property specified in attachment A. The attachment broadly refers to all "documents, books, ledgers, records and objects which are evidence of violations of federal criminal law ..." The attachment then states that this includes, but is not limited to, personnel files, bank records, telephone toll records, cash receipt and disbursement records, sales records, prints attributable to Salvador Dali, and other works attributable to Salvador Dali.[1]

CAG describes the searches as follows: The police arrived at approximately 9:00 to 9:15 a.m. at various locations. They sealed the site with yellow tape labeled "Crime Scene Do Not Cross." Employees were detained at the scene, photographed and coerced into filling out questionnaires (by threats that the police would run a check on an uncooperative employee, or take the uncooperative employee downtown). Entire drawers and cabinets were seized. In one instance, an officer looking through the drawers of a file cabinet was heard to state, "Fuck it, take all of it." There was no attempt to limit the search to Dali related evidence; for example, business files were taken without regard for whether the client had purchased Dali art (the Portmann affidavit stated that he was aware that a special card was created for the file of all clients who were interested in Dali artwork). In another instance, an officer was reported to have said that they were going to take all the paperwork and that they did not have time to go through all of the material in order to decide what was pertinent to the warrant and what was not. Over 8 million dollars worth of artwork was seized. A file cabinet containing the files of CAG's legal counsel was taken, allegedly containing information protected by the attorney-client privilege. Finally, many individual items not listed were taken: an employee's certificate of pension and profit sharing plan, letters of commendation from CAG's president, and personal diaries.

## DISCUSSION

### I. OVERBREADTH OF THE WARRANTS

#### A. The General Rule

The Fourth Amendment requires that for a warrant to be valid, it must "particularly

---

**1.** The list reads in full: "records of completed sales; customer correspondence including complaint files and refund related documents; personnel files including payroll records; lists of current and former employees; employee compensation records for all employees, including but not limited to salesmen, art consultants, gallery directors and managers; records of payments to shareholders' financial records of customer account statement sheets; bank records, including but not limited to canceled checks, monthly account statements and deposit slips; cash receipt and disbursement records; telephone toll records; mail and telegram records including customer mailing lists; sales literature; sales training materials, including written sales pitches and program descriptions; tape recordings relating to sales business; customer contracts and records; business contracts including invoices relating to sources of artwork; business agreements; certificates of authenticity; lists of curators; curator contracts; calendars, internal memoranda and handwritten notes; diaries; key punch computer cards; computer floppy disks and diskettes; computer printout sheets with printouts of Information Systems Design programs; computer memory banks; computer tapes or other data storage devices; prints attributable to Salvador Dali, numbered, unnumbered, signed, unsigned; other works of art attributable to Salvador Dali; lead cards, lead sheets, lead source material; sales records and customer/client information; lithographic and etching plates; blank sheets of paper used for art reproduction, signed and unsigned (Rives, Japon, and Arches paper); insurance documents relating to refund insurance coverage and refund claims."

describe[e] the place to be searched, and the persons or things to be seized." This particularity requirement makes "general searches under [a warrant] impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927); *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir.1982).

In general, the Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a "general exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). As stated by the court in *United States v. Washington*, 797 F.2d 1461 (9th Cir.1986), "where a business is searched for records, specificity is required to ensure that only the records which evidence crime will be seized and other papers will remain private." *Id.* at 1472.

In this case, the warrant contains nothing to limit the scope of the search and seizure of business records. The warrant does not specify the time period to which the documents must pertain, any particular transactions to which the documents must be concerned, or the crime suspected of being violated. Thus, the warrants "effectively authorized the inspectors to cart away anything they could find on the premises," *Roberts v. United States*, 656 F.Supp. 929, 931 (S.D.N.Y. 1987), thereby giving "carte blanche for the government agents to take away anything that they saw ..." *Voss v. Bergsgaard*, 774 F.2d 402, 404 (10th Cir.1985).

### B. The All Records Doctrine

The government first argues that the warrants comply with the particularity requirement in that they authorize the seizure of virtually all the business-related books, records, equipment, and merchandise of an enterprise. In this manner, nothing is left to the discretion of the executing officers. Second, the government

argues that the breadth of the warrant is justified by the breadth of the probable cause in view of Inspector Portmann's affidavit. In *United States v. Offices Known as 50 State Distributing Company*, 708 F.2d 1371 (9th Cir.), *cert. denied*, 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1983), the court held that a warrant similar to the warrant at issue in this case was constitutionally valid.

The warrant left the executing officers with no discretion. While the seizure was extraordinarily broad, and in that sense "general," under the particular facts of this case the scope of the warrant was justified. It was not possible through more particular description to segregate those business records that would be evidence of fraud from those that would not, for the reason that there was probable cause to believe that fraud permeated the entire business operation of 50 State.

*Id.* at 1374.

In *50 State*, the court relied upon *United States v. Brien*, 617 F.2d 299 (1st Cir.), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980). In *Brien*, the court upheld the constitutionality of a search executed pursuant to a similarly broad warrant. The government searched the premises of a company believed to be involved in the fraudulent sale of commodities options. "The court noted that although the various government agencies had received 250 complaints from the commodities business contacts, the government's probable cause was not limited to evidence as to those complaints, because it could be fairly inferred that the 250 complaints were just the 'tip of the iceberg.'" *50 State*, 708 F.2d at 1374–74 (discussing, *Brien*, 617 F.2d at 308).

In *50 State*, the affidavit supporting the warrant was executed by postmaster Wayne E. Gray. Postmaster Gray described 50 State Distribution Company as a national supplier of advertising specialty products (key chains, pens, and calendars bearing the name and advertising message of the purchaser). It described 50 State's business as directed at small businesses nationwide and a "boiler room" sales opera-

tion which engaged in fraud and misrepresentation in selling its promotional merchandise. *50 State,* 708 F.2d at 1372. The salesmen would call prospective customers and inform them that they had been selected to receive a gift such as a diamond, money clip, steak knife or Betamax recorder. The salesman would then inform the prospect that in order to be eligible for the gift, or to remain eligible for a further drawing, the prospect would have to purchase some of the advertising specialty products. The salesman would claim to have for sale high-quality brand name merchandise that would be sent to the buyer by mail C.O.D. In fact, the merchandise was shoddy and the gifts either never arrived or were substantially worthless. *Id.* at 1373 (describing Postmaster's affidavit).

*50 State* is that "rare case in which even a warrant stating 'Take every piece of paper related to the business' would have been sufficient ... [because] when the whole business is a fraud, the warrant properly may permit the seizure of everything the agents find." *United States v. Bentley,* 825 F.2d 1104, 1110 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 240, 98 L.Ed.2d 198 (1987). The rule established in *Brien,* and followed by the Ninth Circuit in *50 State,* is known as the "all records doctrine."

The issue in these cases, as recognized by the court in *Roberts v. United States,* 656 F.Supp. 929 (S.D.N.Y. 1987), is "what set of facts establishes that an organization is 'permeated with fraud'" in the *50 State* sense. *Id.* at 936. In *50 State,* as in *Brien* and *National City Trading Corporation v. United States,* 635 F.2d 1020 (2d Cir.1980), the entire business of the company was fraud. These cases involved boiler room operations where every transaction, and every step in every transaction was "a cheat from its inception to its consummation, which affidavits underpinning the warrant described in detail." *Roberts,* 656 F.Supp. at 936.

The affidavit in this case does not support the contention that CAG was "permeated by fraud." The affidavit indicates that there is probable cause to suspect that CAG engaged in fraud concerning the work of Salvador Dali. All of the 22 instances of misrepresentations concerned Salvador Dali artwork. The question, however, is whether it can fairly be inferred that the Dali frauds were merely "the tip of the iceberg" and that similar frauds were being perpetrated throughout the business. First of all, the affidavit does not indicate that CAG is a boiler room type of operation which is solely concerned with fraudulent sales practices. Moreover, the very specificity of the evidence presented in the affidavit suggests that the fraud had not permeated the entire operation of CAG, because, if it had, there would have been complaints concerning non-Dali artwork. CAG is not primarily involved in Dali art. Approximately 80% of its business concerns non-Dali art.[2] There is no authority to support the contention that since CAG is involved in fraud relating to Dali artworks, it must be involved in similar frauds concerning other artworks. Such a rule would virtually eliminate the need to particularize a warrant in cases of fraud because the fraud specified could be taken to infer a much broader ranging fraudulent scheme.

Furthermore, in *50 State,* the court distinguished *Cardwell* by stating that "[i]n *Cardwell* ... the government's investigation had already focused on certain parts of the defendant's business records.... In this case, however, no such focused search was possible because the affidavit indicated that the entire 50 State operation was fraudulent." *50 State,* 708 F.2d at 1375.

Like *Cardwell,* the investigation in this case (as indicated through the affidavit) had focused upon Dali-related fraud. There was no evidence of any fraud concerning non-Dali art, and the broad warrant can be viewed as the type of fishing expedition which the Fourth Amendment's particularity and probable cause requirements were designed to prohibit. The war-

---

**2.** Among the artists whose works have been sold through CAG are Red Skelton, Anthony Quinn, Tony Curtis, Elke Summer and Marc Chagall.

rant could easily have been particularized to all business records relating to Dali artworks. Therefore, it would be possible through a more particular description to separate those business records that would be evidence of the type of fraud (Dali-related fraud) indicated in the affidavit from those that would not (non-Dali related fraud).

Finally, the government argues that the warrant falls within the "all records doctrine" because all the records of the business are likely to constitute evidence. The government is relying upon *Williams v. Kunze*, 806 F.2d 594 (5th Cir.1986). In *Williams*, the IRS conducted an investigation of several allegedly fraudulent tax shelter schemes organized and operated on the Cayman Islands. The perpetrator's schemes involved the use of offshore entities and transactions to put funds beyond the reach of the IRS for the purpose of evading income taxes. The warrant permitted the seizure of client files concerning domestic activity as well as offshore activity. The warrant was attacked as overbroad because the affidavit concerned only offshore transactions. The court held that the warrant was constitutional because, "[e]ven though a client file may have contained no documents reflecting offshore transactions, the file may nevertheless provide evidence of Appellants' scheme when considered in accordance with transactions contained in other documents." *Id.* at 599.

The *Williams* decision was based upon the fact that the complex tax schemes would be reflected in client records not specifically concerned with offshore transactions. The domestic records, the court found, were likely to shed light on the entire tax fraud scheme.

In this case, however, non-Dali documents are not likely to shed light on the workings of the fraudulent scheme. The only possible relevance of the non-Dali documents is to expose other fraudulent schemes. However, the only apparent basis for the breadth of the warrant is that if CAG is involved in Dali-related schemes, it is likely to be involved in other such schemes. This inference, however, is not strong enough to pass constitutional muster. There simply is no evidence contained in the affidavit that suggests that CAG was involved in non-Dali related fraud. The case does not fall within the "all records doctrine." Therefore, the warrant must be deemed to fail the particularity requirement of the Fourth Amendment pursuant to *Cardwell*.

## II. APPLICATION OF COURT–MADE EXCEPTIONS TO THE EXCLUSIONARY RULE

### A. The Good Faith Exception

In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Court held that the deterrent effect of the court-created exclusionary rule would not be significantly impaired by recognizing a court-created "good faith" exception to the rule: the Fourth Amendment exclusionary rule does not act to bar the use of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. *Id.*; *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed. 2d 737 (1984).

In *Leon*, the court pointed out that neither the Fourth Amendment, nor the conjunction of the Fourth and Fifth Amendment require, as a necessary corollary, the exclusionary rule. *Leon*, 468 U.S. at 905–06, 104 S.Ct. at 3411. "The wrong condemned by the Amendment is 'fully accomplished' by the unlawful search and seizure itself ..., and the exclusionary rule is neither intended nor able to 'cure the invasion of the defendant's rights which he has already suffered.'" *Id.* at 906, 104 S.Ct at 3412 (citations omitted). Rather, the rule operates as "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* (citations omitted).

In *Leon*, the court balanced the social costs exacted by the rule with the benefit of the rule's deterrent effect on police officers. *Id.* at 907–908, 104 S.Ct. at 3412.

The court held that the deterrent effect which supports the judicially created rule is not significantly impaired through the recognition of a good faith exception to that rule.

Rule 41(e) of the Federal Rules of Criminal Procedure, however, contains an independent rule of exclusion. The rule provides that if the court determines that the property was illegally seized "the property shall be restored and it shall not be admissible in evidence at any hearing or trial."

In *Roberts*, the court held that the two exclusionary rules were distinct. The judicially implied constitutional remedy available under the Fourth Amendment is subject to the judicially created exception for good faith, while the *explicit textual remedy* available under 41(e) is not subject to the court-created exception. *Roberts*, 655 F.Supp. at 933.

In applying Rule 41(e), the court is not making a Fourth Amendment exclusion decision. Rather, it is "applying a procedural remedy dictated by the Federal Rules." *Roberts*, 656 F.2d at 933. The court must determine whether the person is entitled to lawful possession (e.g., is the property contraband) and whether the seizure was illegal. A seizure in violation of the Fourth Amendment "certainly counts as an 'illegal' search under the Rule." *Id.* at 933.

█ Therefore, a motion to suppress based upon violation of the Fourth Amendment brought after an indictment is made pursuant to Rule 12(b)(3) and is subject to the "good faith" exception articulated in *Leon*. A motion to suppress made prior to the indictment is made pursuant to Rule 41(e) and is not subject to the good faith exception. The question is whether the different result created by the distinction recognized in *Roberts* can be justified.

First, as noted in *Roberts*, it is not unusual for statutory standards to be more stringent than Constitutional demands. *Id.* at 933. Accordingly, Rule 16 of the Federal Rules of Criminal Procedure provides for more discovery than constitutionally required by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *Id.* Such disparity is reflective of a democratic society where the legislature is responsible for creating laws and the courts act to enforce those laws. The Constitution, through the Bill of Rights, elevates certain rights above popular decision making and the courts are responsible for limiting the legislature when laws impair protected rights.

Nevertheless, the constitutional requirements serve as the minimum necessary protection, and the legislature has the freedom to provide a greater protection than is constitutionally necessary. In cases like *Leon*, the court recognized that the Constitutional requirements can be fulfilled with the imposition of a less stringent exclusionary rule.[3] Nothing prevents the legislature from creating a more exacting rule. In *Leon*, the Supreme Court held that the deterrence effect of the exclusionary rule would not be sufficiently impaired by a good faith exception so as to *require* the exclusion of evidence. Rule 41(e), however, can be read as Congress' determination that the minimal requirements imposed by the constitutional rule are not sufficient. It is not the role of the judiciary to cut back upon statutorily created protections on individual rights. Such judicial lawmaking is illegitimate in a democratic society.

Second, the starting point of statutory construction is the language of the statute itself. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 2301, 85 L.Ed. 2d 692 (1985); *United States v. Hoffman*, 794 F.2d 1429, 1431–32 (9th Cir.1986). The plain meaning of the statute is controlling "absent a clearly expressed Congressional intention to the contrary." *Hoffman*, 794 F.2d at 1432 (*citing, North Dakota v. United States*, 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed.2d 77 (1983)). As noted in *Roberts*, the drafters choice of language in Rule 41(e) appears to represent a deliber-

---

**3.** The exclusionary rule is necessary to insure that the constitutional values embodied in the Fourth Amendment are protected. Therefore, the court-created exclusionary rule represents the least intrusive deterrent to the violation of the Fourth Amendment rights it is designed to protect.

ate policy decision. In an earlier version, the Rule contained both specific language about remedies and a detailed list of substantive criteria, which did not reflect the full substance of search and seizure law. Fed.R.Crim.P. 41 (Commentary to 1972 Amendments). The 1972 amendments to the Rule replaced the substantive list with the phrase "illegally seized" and maintained the mandatory remedial language (requiring exclusion). *Roberts*, 656 F.Supp. at 934. In 1977 and 1979 Congress amended Rule 41, and preserved the substantive and remedial standards.

It must be recognized that the effect of not applying the *Leon* exception in rule 41(e) cases is to create a difference in result based upon when the request to suppress is brought (before or after the indictment or information). This difference is created by Congress' promulgation of substantive and procedural standards in Rule 41(e), and the absence of such standards in Rule 12(b)(3). The difference in result, however, is not an anomaly.

An indictment or information is the formal commencement of prosecution. A prerequisite to the filing of an indictment or information is a finding (either by a grand jury or by the court at a preliminary hearing) that probable cause exists to believe the defendant is guilty of committing a crime. Allen & Kuhns, *Constitutional Criminal Procedure*, 14–15 (1985). The court-created exclusionary rule was created to deter the government from violating the privacy rights of individuals who have been charged through an indictment or information. The constitutional rule provides the minimal necessary protection to deter the violation of privacy rights. Rule 41(e), however, applies to those individuals who are, at most, the subject of an investigation. There has been no formal finding of probable cause to believe the accused is guilty of a crime. That society may wish to impose a stronger deterrent in order to protect the rights of such individuals is eminently reasonable. The difference in

result caused by this Court's interpretation of Rule 41(e) is a recognition of a policy choice which legislators could reasonably have made and, since the disparity is reasonable, it is not the role of the judiciary to alter the result.

The government contends that this Court's decision is contrary to binding precedent. In *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) *overruled on other grounds, United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the Court applied the constitutional standing requirement to Rule 41(e). In *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 126 (1969), the Court interpreted *Jones* as standing for the proposition that Rule 41(e) is "no broader than the constitutional rule." *Alderman*, 394 U.S. at 173, 89 S.Ct. at 966 n. 6. Finally, in *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613 (1973), the Court cited *Alderman* and *Jones* for the proposition that the Rule 41(e) is "no broader than the constitutional rule." *Id.* at 349 n. 6, 94 S.Ct. at 620 n. 6. This maxim was invoked in each case to support the proposition that the constitutional standing requirement applies to Rule 41(e).

As a preliminary matter, it is important to note that the context in which this maxim has been invoked is essential to understanding the scope of the Court's determination. In each case, the maxim was invoked as authority for the proposition that the long recognized requirements of standing apply to Rule 41(e).[4] The court created exceptions to the exclusionary rule, on the other hand, came twenty-four years after *Jones*. While it is reasonable to assume that Congress intended the long established standing doctrine would apply to Rule 41(e), there is no reason to assume Congress delegated to the federal judiciary the task of creating exceptions to the statutory exclusionary rule when no such exceptions were created until after the creation

---

**4.** The exclusionary remedy was initially articulated by the Supreme Court in *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The lower federal courts *immediately*

began to develop the limitation on the scope of the rule which has become known as the "standing requirement." Allen & Kuhns, at 705–706.

of the rule.[5] Therefore, mere invocation of the maxim is no substitute for analysis.

The standing requirement is not an exception to the exclusionary rule, it is a limitation on the scope of the rule. As Justice Frankfurter, writing for court, stated, "[i]n order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." *Jones*, 362 U.S. at 261, 80 S.Ct. at 731 (*quoting* Rule 41(e)). Rule 41(e) applies the "general rule" that only a member of the class "for whose sake the constitutional protection is given" is protected by the constitution. *Id. (quoting, Hatch v. Reardon*, 204 U.S. 152, 160, 27 S.Ct. 188, 190, 51 L.Ed. 415 (1907)). The court in *Jones* recognized that the only "person aggrieved" by an illegal search or seizure is an individual with standing to invoke his constitutional rights. Any other individual would merely be an incidental beneficiary of the aggrieved's injury.

The court in *Jones* was faced with the question of whether the standing requirement applied to a Rule 12 motion to exclude also applies to a Rule 41(e) motion. There is no reason, as a matter of policy, that the standing requirement should not apply to Rule 41(e). The standing requirement merely assures that the only people protected by the exclusionary rule are the people whom the rule was designed to protect; that is, individuals whose Fourth Amendment rights have been violated. A difference in result based upon the event of filing the information or indictment cannot be rationally justified. Therefore, it is sensible to interpret the statutory rule as incorporating the standing requirement.

The good faith exception to the exclusionary rule is entirely different because the disparity of result based upon the event of filing an information or indictment can be justified as a matter of rational policy-making. It makes sense that the lesser constitutional standard applies to those individuals screened through the information or indictment process. The invocation of a formal charge requires a finding that there is probable cause to believe that the accused is guilty of the crime charged. The more stringent requirements of Rule 41(e), however, apply to those individuals who are merely the subject of investigation. It is reasonable that society would choose, as a matter of policy, to provide a more stringent protection to individuals who are under the watchful eye of the government, but whom the government has yet to formally charge. Thus, in *Jones* a disparity in result could not be rationally justified, but in the context of the good faith exception to the exclusionary rule the disparity is reasonable.

*Jones* and its progeny stand for the proposition that the standing requirement, inherent in the limiting phrase "person aggrieved" and already a well established limitation on the scope of the exclusionary rule when the statute was created, applies to the statutory remedy created under Rule 41(e). The good faith exception to the ex-

---

**5.** The government's reliance on *Jones* rests upon a fundamental oversight concerning legitimate judicial rule making power. In *Jones,* the court looked to the intent of Congress and correctly interpreted a long established limitation on the scope of the exclusionary rule as being within the contemplation of the legislature at the time Rule 41(e) was enacted. The government's theory in the present case, however, must be based upon a *different* theory of statutory interpretation because the good faith exception was created *after* the enactment of Rule 41(e).

The government's contention that the good faith exception applies to Rule 41(e) must be based upon a theory of delegated lawmaking authority. Delegated lawmaking "takes place when Congress ... [has] conferred power on the federal courts to fashion federal rules in order to round out or complete ... a statutory scheme." T. Merrill, *The Common Law Powers of Federal Courts*, 52 U.Chi.L.Rev. 1, 40–46 (1985). This exercise of rulemaking power is a legitimate form of judicial activity when (1) the enacting body specifically intended to delegate lawmaking power to the federal courts; and (2) the textual provision giving rise to the delegation "circumscribes or 'frames' with reasonable specificity the area in which judicial lawmaking is to take place." *Id.* at 41. Thus, *Jones* lends no support to the government's position because it is based upon a different form of Congressional intent.

clusionary rule, however, is a deviation from the clear language of the Rule. The Rule provides a remedy for a "person aggrieved by an unlawful search and seizure." Unlike the standing requirements which have been held to limit the scope of Rule 41(e), the court-created *exceptions* to the exclusionary rule cannot be reconciled with the plain meaning of the statute. More importantly, the notion of a standing requirement that limits the scope of the exclusionary rule was well within the contemplation of the framers of Rule 41(e). The good faith exception to the rule, however, was less than a glimmer in Justice White's eye when present Rule 41(e) was promulgated. The language of the Rule provides that the remedy of exclusion should be applied if the property was "illegally seized." There is no room in this language for a good faith exception. Since the disparity of result is not arbitrary, the rule should be understood as meaning what it says; property should be returned and excluded from evidence if it was "illegally seized."

## GOOD FAITH EXCEPTION APPLIED

However, even if the good faith exception to the exclusionary rule is applicable to Rule 41(e), the officers have failed to meet its requirements.

*Leon* holds that the exclusionary rule should not be applied when the officer conducting the search acted in objectively reasonable reliance on a warrant issued by a detached and neutral magistrate, even if the warrant is subsequently determined to be invalid. There are two issues which must be resolved before the exception is deemed to apply: (1) The good faith exception does not apply when the officer obtains a warrant based upon a "bare bones" affidavit and then relies on good faith execution by innocent colleagues in order to sustain the warrant. *United States v. Michaelian,* 803 F.2d 1042 (9th Cir.1986); and (2) the exception does not apply where the warrant is so facially deficient that objective reasonable reliance is precluded by the warrant's obvious inadequacy. *Id.* at 1047. Finally, the government bears the burden of proving that its agents' reliance on the warrant was objectively reasonable. *Id.* at 1048.

■ This is not a case where the warrant is supported by a bare bones affidavit. The 34 page affidavit of the Postal Inspector is more than sufficiently detailed to pass this first hurdle. However, the warrant in this case was so overbroad as to be facially invalid, thereby precluding good faith reliance on the validity of the warrant.

In this case, Postal Inspector Portmann submitted a lengthy affidavit modeled after one issued in New York in 1985. New York Postal Inspector DeMuro supplied a model affidavit to Portmann in order to assist Portmann in the CAG investigation. DeMuro also supplied a warrant, virtually identical to the warrant in this case, which had been approved in the Southern District of New York in 1986, and another (substantially identical) that had been approved in the Eastern and Southern District. Portmann also consulted with United States attorneys at length prior to the application for the warrant. They approved the warrant based upon its similarity to the warrant used in *50 State.*

The ultimate question, however, is whether an officer could in good faith believe that this case is similar to cases such as *50 State* where facially broad warrants have been upheld. An attempt to create new law does not fall within the *Leon* exception. The Court finds that the facts in this case, as related by Inspector Portmann in his affidavit, preclude reliance upon *50 State.* Such reliance is at most wishful thinking on the part of the officer. There was no indication that CAG was permeated in fraud in a manner similar to the boiler room operations where the all records doctrine has been applied. This obvious difference precludes the government from claiming that the executing officers relied in good faith upon the validity of the warrant. In fact, Postal Inspector Portmann's communications with Inspector DeMuro indicate that Portmann was keenly aware that he was riding the outer limits of the Fourth Amendment. His decision to

test those limits, however, precludes reliance upon *Leon.*

B. Inevitable Discovery Exception: *Nix v. Williams*

■ In *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Court ruled "exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial." *Id.* at 446, 104 S.Ct. at 2510.

"Like the good faith exception, however, the inevitable discovery doctrine is a judicially crafted exception to a judicially crafted remedy for violations of constitutional rights." *Roberts,* 656 F.Supp. at 936 (citing, *Nix,* 467 U.S. at 441–44, 104 S.Ct. at 2507–09). Therefore, the inevitable discovery exception to the exclusionary rule does not apply to Rule 41(e). However, even if the exception does apply, it will not aid the government in this case.

APPLICATION OF INEVITABLE DISCOVERY EXCEPTION

■ The government argues that because grand jury subpoenas of equivalent scope were served at the execution of the warrant, the evidence seized would have inevitably been discovered. The argument is that CAG would have honored the subpoenas, and therefore, all the items seized would inevitably have been discovered pursuant to the subpoena.

This argument is not well taken given the facts presented to the Court. In an affidavit, petitioners' counsel states that because of the overbroad nature of the subpoena, petitioners and government counsel narrowed the subpoenas by agreement. Thus, the same problems of overbreadth affect the enforceability of the subpoenas.

Moreover, the subpoenas were served after the search and seizure. At the time the subpoenas were served there was nothing left to discover. This leads to the inevitable conclusion that the subpoenas were used as an "insurance policy" in the event of a subsequent invalidation of the search and seizure. This should not be permitted.

Such a rule would allow the government to violate the Fourth Amendment with impunity as long as they could obtain a subpoena.

The government has not shown the type of inevitable discovery contemplated by the court in *Nix.* In *Nix,* the court held that the murder victim's body would have inevitably been discovered absent the defendant's unconstitutionally elicited statements because: (1) the police had organized and put into operation a 200–member search team; (2) this team had been instructed to check all roads, ditches and culverts (the body was placed next to a culvert in a ditch beside a gravel road); (3) the team was searching specific grid areas marked off a map; and (4) it was clear that the search parties were approaching the actual location of the body. *Nix,* 467 U.S. at 448–49, 104 S.Ct. at 2511–12. In our case, the government has not shown a similar degree of inevitability. More importantly, the use of a subpoena as an insurance policy is inconsistent with the inevitable discovery exception. That exception, like the good faith exception, was created because the court believed that such exceptions do not significantly impair the deterrent effect of the exclusionary rule. The use of a subpoena, however, could significantly impair the deterrent effect of the rule. In cases like this, the government need not worry about the strictures of the particularity and probable cause requirements because they have obtained a subpoena as protection. The inevitable discovery exception was not designed to place the means of invoking the exception in the hands of the government.

III. PROPERTY TO BE SUPPRESSED AND RETURNED

■ The only portions of the warrant that are sufficiently particularized are the following: (1) prints attributed to Salvador Dali; numbered, unnumbered, signed, unsigned; and (2) other works of art attributable to Salvador Dali.

In *Cardwell,* the court ordered total suppression because no portion of the warrant

was sufficiently particularized. *Cardwell,* 680 F.2d at 78–79. In this case, only the Dali provisions are sufficiently particularized. All other evidence should be suppressed and returned.

IT IS SO ORDERED.