UNITED STATES of America,

v.

Dennis C. HICKEY, Maria Hickey, Joseph Carione, Angelo Carione, Andrew Russo, Dennis E. Hickey, Hickey's Carting, Inc., Grand East, Inc., Competition Carting, Inc., Grand Carting, Inc., and William Grainger, Defendants.

No. 96–CR–693 (DRH).

United States District Court,
E.D. New York.

Aug. 12, 1998.

Zachary W. Carter, U.S. Atty., E.D. of New York by Paul Weinstein, Asst. U.S. Atty., Robert P. LaRusso, Asst. U.S. Atty., Brooklyn, NY, for U.S.

LaRossa Mitchell & Ross by James M. LaRossa, New York City, Deborah Schwartz, New York City, for Dennis C. Hickey.

Clayman & Rosenberg by Brian D. Linder, New York City, for Maria Hickey.

Andrew Weinstein, New York City, for Hickey Carting, Inc., Competition Carting, Inc., Grand East, Inc.

Salvatore Marinello, Mineola, NY, for Joseph Carione.

David Horowitz, Bay Shore, New York, for Grand Carting, Inc.

Santangelo, Santangelo & Cohen by George L. Santangelo, New York City, for Andrew Russo.

Dominic J. Porco, Scarsdale, NY, for Angelo Carione.

Richard Rosenberg, New York City, for William Grainger.

## MEMORANDUM AND ORDER

HURLEY, District Judge.

### INTRODUCTION

The captioned case involves eleven defendants. All but one, *viz.*, William Grainger, are charged with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, via their respective activities as members of a criminal organization identified as the Hickey organization. In addition, various other crimes are alleged in the Sixty Count Indictment against some, or all, of the defendants including, *inter alia*, mail fraud, 18 U.S.C. §§ 1341, 1346, and money laundering, 18 U.S.C. § 1956.

Although there are allegations in the introductory portion of the Indictment that the Hickey Organization, as well as certain identified organized crime families, operate not only here, but also in other parts of the United States, all of the conduct leading to the return of the original Indictment—including the charges most relevant for purposes of the present motions, *viz.*, the RICO, RICO conspiracy, mail fraud, and money laundering charges (hereinafter referred to as the "Islip fraud" or "the scheme")—occurred in the Town of Islip. That conduct is well synopsized in the following excerpt from the September 10, 1996 affidavit of Special Agent Donald W. McCormick submitted in support of the application for the five search warrants that were issued in this case:

> The indictment alleges that the defendants, and others, operated an enterprise which conducted a fraudulent scheme in order, among other goals, to make money and maintain control of the commercial garbage customers within the Town of Islip. At the time of the scheme alleged in the indictment, DENNIS C. HICKEY and his company HICKEY'S CARTING, INC., although barred from receiving a permit for commercial garbage collection in the Town of Islip, engaged a nominee company, GRAND CARTING, INC., to obtain a permit from the Town of Islip to collect the commercial garbage within the Town. Nominee companies, including COMPETI-

TION CARTING, INC. and GRAND EAST, INC., were utilized by the defendants to hide the involvement of DENNIS C. HICKEY and his companies in the collection of commercial garbage in the Town of Islip. As set out in the indictment, bank accounts in the names of the nominee companies were utilized so that customers who were in fact serviced by HICKEY'S CARTING, INC. would write checks for carting to entities other that [sic] HICKEY'S CARTING, INC. The monies were then transferred, through a series of financial transactions, to accounts and deposited for the benefit of DENNIS C. HICKEY and others.

(Defs.' Mem.Ex. G ¶ 3.)

Defendants, in their joint motions, have attacked the legal sufficiency of a number of the counts, as well as the legitimacy of the searches conducted pursuant to search warrants which were executed contemporaneously with the defendants' arrests. In addition, defendants seek a bill of particulars, a list of the government's witnesses, and a severance for Maria Hickey and William Grainger.[1]

Defendants' arguments shall be addressed seriatim.

## DISCUSSION

*Count One of the Indictment, i.e., the Substantive RICO Charge, Properly Charges a Violation of Section 1962(c)*

Defendants seek the dismissal of Count One upon the ground that it impermissibly alleges a single, unitary pattern of racketeering activity under which each defendant is charged with responsibility for the racketeering acts of all of the other individuals named in the count. This, it is claimed, runs afoul of the principle that "under RICO, an accusatory instrument must allege, *inter alia,* that each defendant, *individually,* committed his or her own 'pattern of racketeering activity.'" (Defs.' Mem. at 3.)

Before further addressing this motion and the other applications made by defendants which are as yet undecided, a procedural point should be made. The present Indictment is the Third Superseding Indictment. Prior to that Indictment being returned, defendants made an omnibus motion directed at the Second Superseding Indictment. By letter dated March 10, 1998, the Court was advised by defendants "that, with the exception of subsection (d) of Point V [arguing that the money laundering racketeering acts are duplicitous] which is withdrawn, all of the defendants' previously filed pre-trial motions are equally applicable" to the present accusatory instrument.

Paragraph 49 of the Second Superseding Indictment alleged in pertinent part as follows:

"In or about and between January 1979 and September 1996, both dates being approximate and inclusive, within the Eastern District and elsewhere, the defendants DENNIS C. HICKEY, MARIA HICKEY, JOSEPH CARIONE, ANGELO CARIONE, ANDREW RUSSO, DENNIS E. HICKEY, HICKEY'S CARTING, INC., GRAND EAST, INC., COMPETITION CARTING, INC., and GRAND CARTING, INC., together with others, known and unknown, being persons employed by and associated with the Hickey Organization, an enterprise which engaged in, and the activities of which affected interstate and foreign commerce, knowingly and intentionally conducted and participated, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity, that is, through the commission of Racketeering Acts One through Thirteen. . . ."

Paragraph 50 of the Third Superseding Indictment tracks the language of its predecessor, except it deletes the language at the end of the above excerpt, to wit, "that is, through the commission of Racketeering Acts One through Thirteen."

■ Against the backdrop of the relevant charging language from the earlier, as well as the current, Indictment, a brief review of the law pertaining to Count One will be

---

**1.** The motion by Maria Hickey for a severance was denied by bench decision rendered on June 19, 1998; as part of that same bench decision, William Grainger's severance motion was granted.

provided.[2] The ten defendants named in the count have been charged with violating Section 1962(c) of Title 18, United States Code. That section renders it unlawful for "any person" to "conduct or participate, directly or indirectly, in the conduct of [an] ... enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). An "enterprise" includes "any union or group of individuals associated in fact," § 1961(4), and a "pattern of racketeering activity" is defined as "at least two acts of racketeering," § 1961(5), with a showing of relatedness and continuity among the predicate acts. *E.g.*, *United States v. Aulicino*, 44 F.3d 1102, 1110 (2d Cir.1995) (citing *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 240, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989)).

■ Defendants correctly underscore the principle that a RICO conviction requires proof that each defendant personally engaged in a pattern of racketeering activity. *E.g.*, *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir.1992); *United States v. Private Sanitation Indus. Assoc. of Nassau/Suffolk, Inc.*, 793 F.Supp. 1114, 1140–41 n. 37 (E.D.N.Y.1992). Which is to say "[t]he focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant, rather than the collective activities of the members of the enterprise...." *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987).

■ With the above principles in mind, attention will be focused on the purported pleading deficiency in Count One. Defendants maintain that the count improperly charges each of the ten named defendants with vicarious responsibility for the alleged racketeering acts of the other defendants and, in so doing, endeavors to establish the requisite "pattern of racketeering activity" in a collective, as distinct from an individual, fashion. However, a perusal of the count indicates that it suffers from no such infirmity.

The arguably confusing manner in which each defendant is individually charged with

having participated in a pattern of racketeering activity in paragraph 49 of the Second Superseding Indictment—to wit, "through the commission of Racketeering Acts One through Thirteen"—has been deleted. What remains in the corresponding portion of the current Indictment, (Indictment ¶ 50), is straightforward and appropriately alleges a violation of Section 1962(c).

■ The mere fact that paragraph 50 retains the claim that defendants participated in the affairs of the Hickey Organization through a general pattern of racketeering activity does not void the pleading. Although a defendant may not be held to answer for the racketeering acts of another in determining whether he or she has personally engaged in a pattern of racketeering activity, that does not mean that the acts of codefendants are irrelevant in assessing individual culpability. Indeed, the racketeering acts of others may be germane for a number of purposes, including to show the existence of the enterprise as well as to establish continuity and relatedness among the predicate acts with which each defendant is individually charged. *E.g.*, *DiNome*, 954 F.2d at 843–44; *United States v. Indelicato*, 865 F.2d 1370, 1383, 1384 (2d Cir.1989); *United States v. Gambino*, 809 F.Supp. 1061, 1075 (S.D.N.Y. 1992).

Finally, a perusal of Count One clearly indicates that it does not allege a "single, unitary 'pattern of racketeering activity' " as claimed by defendants. To the contrary, each racketeering act specifically lists those defendants who are alleged to have engaged in the criminal conduct cited, and the listing varies depending on the racketeering act. By way of example, Racketeering Act One, entitled "Mail Fraud," names all of the defendants, except for Grainger, whereas Racketeering Act Fourteen, entitled "Mail Fraud— Garbage Truck No. 2," charges only Dennis C. Hickey and Hickey's Carting, Inc. ("Hickey's Carting").

In sum, Count One does not allege a single pattern of racketeering activity and thus does not violate the requirement that each

---

**2.** Unless otherwise noted, all references from this point forward to the "Indictment" or "count" pertain to the Third Superseding Indictment.

defendant must commit his or her own pattern of racketeering activity to be legitimately charged with a violation of Section 1962(c). Accordingly, defendants' motion to dismiss Count One on that ground is denied.

### Count Two of the Indictment, i.e., the RICO Conspiracy Charge, Properly Charges a Violation of Section 1962(d)

Count Two charges all defendants, except for Grainger, with membership in a RICO conspiracy in violation of Section 1962(d) of Title 18, United States Code. Defendants have attacked this count upon the same ground urged with respect to Count One, i.e., that it impermissibly pleads a single pattern of racketeering activity. (Defs.' Mem. at 13.)

That ground is similarly unavailing here for the reasons previously provided. Mention should also be made of the third paragraph of Count Two, that being paragraph 68 of the Indictment, which alleges that:

> Each defendant named in paragraph 67 agreed that at least two of the acts of racketeering set forth in paragraphs 51 through 65 would be committed in the conduct of the affairs of the Hickey Organization.

■ That charging language dovetails with the holding in Salinas v. United States, —— U.S. ——, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997), in which the Supreme Court explained that "an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense" is not "excuse[d] from the reach of the [RICO] conspiracy provision." Id. —— U.S. ——, 118 S.Ct. at 478. Rather, a conspiracy conviction may be sustained under subsection (d) if a co-conspirator committed at least two acts of racketeering and the defendant "knew about and agreed to facilitate the scheme." Id.

For the reasons indicated, defendants' attack on Count Two is found to be without merit.

### Racketeering Act One (A) And Count Four Properly Charge Mail Fraud

Racketeering Act One (A) and Count Four charge all of the defendants, but Grainger, with having devised an artifice to obtain "money and property" from the Town of Islip—"to wit: revenues from fees to be derived from the lawful disposal of waste materials at [the] Town of Islip's disposal facilities, by means of false and fraudulent ... representations" and with using the mails to further the fraudulent scheme. (Indictment ¶¶ 51, 74.)

In order to understand the nature of the property which the grand jury has charged that defendants schemed to obtain from Islip, one must refer back to paragraph 47 of the Indictment which is incorporated by reference in the prefatory language of both Racketeering Act One and Count Four. That paragraph reads:

> At relevant times, the Town Code of the Town of Islip required that all solid waste generated within the Town be disposed of at Town facilities. In violation of this requirement of the Town Code, during relevant times GRAND EAST [3] did not dump 100% of the solid waste collected within the Town of Islip at Town facilities. This resulted in fewer billings from the Town for the use of Town facilities, and, consequently, an economic loss to the Town.

■ The defense claims that the effort by the government "to criminalize, through the mail fraud statute, a violation of the Islip 'flow control' ordinance" has resulted in a facially flawed count and racketeering act. (Defs.' Mem. at 21.) Its argument begins with a recitation of the essential elements of mail fraud under Section 1341 of Title 18, United States Code, viz., (1) a scheme to defraud, (2) intended to obtain money or property from a victim, and (3) use of the mails to further the scheme. (Id. citing, inter alia, United States v. Wallach, 935 F.2d 445, 461 (2d Cir.1991)). The claimed

---

**3.** The Solid Waste Permits were issued to Grand Carting, Inc. (Indictment ¶¶ 41, 42.) However, the actual collection of waste was allegedly done by Grand East, Inc., which is identified by the grand jury as a "front company" for Hickey's Carting. (Id. ¶ 39.) Although it would seem that the legal obligation to use the Town disposal facilities was with Grand Carting, Inc. as the permit holder, the grand jury, for some reason that is not readily apparent, identified the delinquent party as Grand East, Inc.

defect in Racketeering Act One (A) and Count Four pertains to the second of the three elements. It is defendants' contention that neither the targeted racketeering act nor count "charge[s] the deprivation of a property interest of the alleged victim . . . since Islip did not have a property right, nor even an expectation of revenue from the differential between the dump fees defendants did pay to Islip and the revenue Islip would have received if Grand East, Inc. [ ("Grand East") ] had dumped 100% of the waste collected in Islip." (*Id.* at 21–22.)

In *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the Supreme Court declared a flow control ordinance unconstitutional as improperly infringing on interstate commerce. *Id.* 511 U.S. at 386, 114 S.Ct. at 1680. Defendants maintain that the flow control ordinance in *C & A Carbone* is "virtually identical" to Islip's. (Defs.' Mem. at 21.) For that reason, it is said that Islip had no protectable interests in "money or property" to be derived from the dump fees supposedly evaded by Grand East. (*Id.*)

Section 10 of Chapter 21 of the Code of the Town of Islip obligates a carting permit holder, such as Grand Carting, Inc. ("Grand Carting"), to bring the solid waste collected within the Town to Town disposal facilities. In the government's view, the purported unconstitutionality of this provision of the Town Code is not properly raised at this stage of the proceedings and is, in any event, irrelevant for present purposes, citing, inter alia, *United States v. Trapilo*, 130 F.3d 547 (2d Cir.1997) [*petition for cert. filed*, 66 U.S.L.W. 3749 (May 5, 1998)]. (*See* Gov't's Resp. at 14.)

The government has the better side of the argument. The question before the Court concerns the facial sufficiency of the accusatory instrument, not whether the government ultimately will make out a *prima facie* case or establish defendants' guilt beyond a reasonable doubt. Here, the targeted portions of the Indictment essentially track the language of Section 1341 and contain sufficient detail to permit each listed defendant to prepare his or her defense and to be in a position to assert the defense of double jeopardy should the need subsequently arise.

Such being the case, Racketeering Act One (A) and Count Four are not facially flawed and thus not subject to dismissal.

■ But even if the analysis is taken beyond the face of the Indictment and consideration is given to the nature of the government's anticipated proof at trial, defendants' argument is off target. Section 1341 makes it illegal to devise a scheme to defraud, or for the obtaining of money or property by means of false or fraudulent representations, coupled with the use of the mails to advance the scheme.

Granted, Grand East's mere failure to comply with Islip's flow control ordinance, if established, would not satisfy the second, or "property," element of the crime. But if that failure was part of a scheme to defraud Islip of what defendants *understood* to be a property right of the Town—as distinct from, *e.g.*, being based on reservations about the ordinance's constitutionality or other non-fraudulent reasons—the result would be otherwise. By way of analogy, if an individual schemes to defraud another of his or her life-savings which, unbeknownst to the schemer, are non-existent, and uses the mail for that purpose, he or she has committed mail fraud. *Cf. Trapilo*, 130 F.3d at 552 ("At the heart of this indictment is the misuse of the wires in furtherance of a scheme to defraud the Canadian government of tax revenue, not the validity of a foreign sovereign's revenue laws . . . [and thus] there is no obligation to pass on the validity of Canadian revenue law. . . .") (citations omitted).

In sum, Racketeering Act One (A) and Count Four allege the essential elements of Section 1341 and are otherwise facially adequate. Moreover, even if the purported insufficiency of the government's anticipated proof at trial is factored into the analysis, it appears that the targeted racketeering act and count are not subject to dismissal and, certainly, not at this stage of the proceedings.

*Racketeering Act One (B) and Count Five*
*Adequately Charge a Violation of*
*Section 1346*

Racketeering Act One (B) and Count Five allege that the named defendants devised "a

scheme and artifice to defraud the Town of Islip of the intangible right of honest services, to wit: the ability to select qualified persons to provide solid waste collection and disposal services within the Town of Islip." (Indictment ¶¶ 52, 76.)

In seeking the dismissal of this racketeering act and the corresponding count, the defendants opine that the grand jury "apparently" intended to charge defendants with scheming "to deprive Islip of the honest services of its employee," *viz.*, an employee involved in the issuance of carting permits. (Defs.' Mem. at 24.) The basis for defendants' assumption is the belief that an intent to corrupt a town employee is an essential element of the alleged mail fraud scheme. (*Id.* at 25.) The absence of such an allegation in the Indictment, defendants argue, renders the pleading facially insufficient.

Defendants further argue that "the intangible right to honest services utilized in Section 1346 is a precise term and refers to the situation where an individual owing a fiduciary duty ... is corrupted." (Defs.' Reply at 16.)

Defendants' arguments will be addressed *seriatim.*

1. *Section 1346 Does Not Require That Scheme Entail Efforts to Corrupt a Town Employee*

■ Racketeering Act One (B) and Count Five charge a violation of 18 U.S.C. § 1346. That Section provides:

> For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

Does Section 1346 pertain solely to a scheme intended to deprive the Town of Islip of its right to receive honest services from its governmental officials and employees?

As noted, Section 1341 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses," has committed the crime of mail fraud if the mails are utilized to further the scheme. In *McNally v. United States,* 483 U.S. 350, 107 S.Ct.

2875, 97 L.Ed.2d 292 (1987), the Supreme Court held that the terms "money or property" and "scheme or artifice to defraud" had to be read conjunctively, *i.e.,* as limiting one another. *See id.* 483 U.S. at 358–60, 107 S.Ct. at 2880–82. Accordingly, the scope of Section 1341—as explained in *McNally*—pertains solely to schemes in which the aim was to obtain money or property from the victim. That conclusion was contrary to prior holdings in numerous Courts of Appeals decisions, in which the two phrases were read in the disjunctive, thereby criminalizing both schemes to deprive another of money or property, as well as schemes aimed at depriving the victim of a less tangible right, such as the right to honest services. *See id.* 483 U.S. at 355–56, 107 S.Ct. at 2879.

To legislatively override the Supreme Court decision in *McNally,* Section 1346 was enacted. As explained by Senator Biden, the then Chair of the Senate Judiciary Committee:

> This section overturns the decision in *McNally v. United States* in which the Supreme Court held that the mail and wire fraud statutes protect property but not intangible rights. Under the amendment, those statutes will protect any person's intangible right to the honest services of another, including the right of the public to the honest services of public officials. The intent is to reinstate all of the pre-*McNally* caselaw pertaining to the mail and wire fraud statutes without change.

134 Cong.Rec. S17360–02 (Nov. 10, 1988) (statement of Senator Biden).

Defendants' argument has been advanced absent decisional support. It rests, rather, on a questionable reading of the previously quoted remarks of Senator Biden. Defendants synopsize those remarks thusly:

> Prior to the enactment of 18 U.S.C. section 1346, Senator Joseph Biden, Chairman of the Senate Judiciary Committee, stated that the target of the scheme to defraud under section 1346 is the deprivation of the official's honest services. 34 Cong.Rec.S. at 17360–02, daily ed. 11/10/88. What is criminalized, therefore, is the intent to de-

prive the public of the official's honest services.

(Defs.' Mem. at 24.)

By stating that "[u]nder the amendment, those statutes will protect any person's intangible right to the honest services of another, including the right of the public to the honest services of public officials," did the Senator intend to indicate that the statutory protection afforded to the government is more circumscribed than that provided to non-governmental victims?

The use of the word "including" typically suggests that what is being said is meant as an example, rather than a complete or exhaustive listing. But, in any event, reference to the legislative history of an enactment is inappropriate when the statute, on its face, is clear as to the subject under discussion. Section 1346 falls within that category.

A reading of the Section, in conjunction with Section 1341, supports the conclusion urged by the government, *viz.*, that the statute does not require employee involvement as one of its necessary elements. Had Congress intended such a restriction to be part of the statutory scheme, it could have simply so provided. The fact that it did not vitiates defendants' argument.

### 2. The Presence of a Fiduciary Duty is Not Required Under Section 1346

■ The defense also maintains that Section 1346 is limited to the honest services expected of "an individual owing a fiduciary duty to a public or private entity." (Defs.' Reply at 16.) This argument, like the related position that the statute is inapplicable absent involvement by a Town employee, is inconsistent with the plain and expansive language of Section 1346 and, accordingly, is found to be without merit. *Cf. United States v. Sancho*, 957 F.Supp. 39, 42 (S.D.N.Y.1997) ("The statute [Section 1346] does not expressly limit culpability to cases involving schemes to deprive another of 'honest services *of a fiduciary.*' There is simply no

indication from the text of §§ 1343 and 1346 that a necessary element of wire fraud is the existence of an actual fiduciary duty.").

### 3. Conclusion

Racketeering Act One (B) and Count Five adequately allege the crime of mail fraud. Contrary to defendants' position, the absence of verbiage pertaining to an "employee" and a "fiduciary duty" in the charging language does not invalidate the charges, for neither is an essential element of the crime.[4]

### Racketeering Act One (C) and Count Six Adequately Charge Violations of the Mail Fraud Statute

Racketeering Act One (C) is entitled "Mail Fraud—Taking of Money and Property—Customers in the Town of Islip." It, as well at Count Six, charge that defendants "did knowingly and intentionally devise ... a scheme ... to obtain money and property from carting customers in the Town of Islip, to wit: fees paid for lawful collection and disposal of solid waste, by means of false and fraudulent pretenses and representations and, for the purpose of executing such scheme" utilized the mail. (Indictment ¶¶ 53, 78 .)

Defendants' attack on this racketeering act and the corresponding substantive count is twofold: (1) the Indictment fails to provide adequate notice concerning the nature of the charge; and (2) "the government cannot establish that the defendants intended to defraud their customers." (Defs.' Mem. at 30.)

■ Proceeding in reverse order, defendants' second complaint, *i.e.*, an expected failure of proof by the prosecution, is not properly raised as part of a motion to dismiss an Indictment. The sufficiency of the government's proof is a subject properly addressed at trial, not now. Nonetheless, some of the arguments advanced by the defense will be discussed, at least preliminarily, with the thought that this procedure may serve to expedite the trial. Before doing so, however,

---

**4.** There are a number of other issues that pertain to this racketeering act and count, such as whether the manner in which it is said that Grand Carting received Solid Waste Permits from Islip, and the events thereafter in servicing the involved "stops," deprived the Town of "honest services" within the purview of Section 1346. The answer to that, and related questions, will depend upon the proof adduced at trial.

brief mention will be made of defendants' initial point, *i.e.*, the claimed insufficiency of notice as to the nature of the charge.

██ Defendants complain that "the Indictment contains no indication as to what misrepresentations defendants are alleged to have made which defrauded the customers." (*Id.* at 28.) There is no requirement that the Indictment provide the specific representations alleged to have been made. To the extent the defense believes that further specificity is needed for them to prepare for trial and to be in a position to plead double jeopardy should the need arise, the following synopsis by the government of relevant provisions in the Indictment should fill the perceived void:

> The Indictment alleges, at Racketeering Act 1(C) and Count Six, that the aim of the scheme to deceive customers regarding the true identity of the company that serviced them was to obtain money in the form of fees for service, in other words, to obtain the fees dishonestly. The government intends to prove at trial that these false pretenses were material to customers, and that the customers were deprived of money thereby. In addition, the government intends to prove that the fraud was implemented, as alleged in the Indictment, to keep the organized crime cartel in place, and collect inflated fees as an aim and result of the fraud.

(Gov't's Resp. at 41–42.)

In sum, Racketeering Act One (C) and Count Six, when read in conjunction with the introductory paragraphs of the Indictment, provide sufficient notice of the charges. The government's explanation of its theory of this part of the prosecution—which will be treated as the equivalent of a bill of particulars—provides further specificity.

Attention will now be directed to the issues raised by defendants regarding the likely character of the government's proof, which, as noted, defendants have prematurely raised. The first such issue is whether fraudulent misrepresentations made by Grand Carting to Islip in its applications for carting permits may legitimately serve as the basis to claim that defendants defrauded carting customers within the Town.

██ There is nothing in the legislative language which suggests that the person or entity to whom a false representation is made must be an intended victim of the fraud for such conduct to be proscribed by Section 1341. If a defendant makes a false representation to one individual, *under circumstances evincing an intent to harm another*, that scenario, *albeit* unusual, would suffice under the statute. *Cf. United States v. Castor,* 558 F.2d 379, 383–84 (7th Cir.1977) (explaining that fraudulently inducing liquor authorities to issue permits may violate Section 1341, noting that alleged scheme reduced other applicants' chances to make profits) and cases cited therein. Accordingly, misrepresentations made to Islip, for the purpose of gaining access to "stops" within the Town, are not, *ipso facto,* beyond the reach of Section 1341. But merely deceiving the Town, if not coupled with the intent to deprive carting customers of money or property (via, for example, collecting excessive fees through its purported control of the market as an organized crime cartel, or otherwise by providing carting customers with something less than they bargained for), *cf. United States v. Starr,* 816 F.2d 94, 98–100 (2d Cir.1987), would be insufficient to sustain a conviction.

In sum, Racketeering Act One (C) and Count Six are not facially insufficient. Adequate notice of the charge has been provided. The theory of the prosecution is not out of sync with the language of Section 1341, although it does represent an unusual application of the statute.

*Counts Seven Through Thirty–Two (the Substantive Money Laundering Counts), Count Three (Which Charges a Money Laundering Conspiracy With Respect to the Town of Islip Mail Fraud), and the Money Laundering Racketeering Acts of Count One Adequately Charge Violations of Section 1956*

Defendants argue that the money laundering charges are insufficient as a matter of law due to their purported failure to specifically identify the mail fraud scheme which is claimed to be the underlying "specified unlawful activity," and further argue that the financial transactions at issue did not repre-

sent the "proceeds" of mail fraud. And finally, it is claimed that the charges are subject to dismissal for their failure to allege that the "financial transactions" affected interstate or foreign commerce. The arguments of the defense are found to be without merit.

■ Defendants' initial argument ignores the plain language of the Indictment. It, as observed by the government, "makes clear that the mail fraud scheme producing the proceeds relevant to the money laundering counts is the fraud in the Town of Islip." (Gov't's Resp. at 47.) The charged scheme was elaborate, giving rise to a series of different fraud counts categorized roughly as those falling within either the "dump fee," "honest services," or scheme "to defraud carting customers in Islip" classification. Yet, all facets are part of one scheme which has been exhaustively detailed by the grand jury. No further detail is required of the accusatory instrument for it to survive the present facial challenge. Accordingly, defendants' argument that the Indictment lacks sufficient specificity of the underlying criminal conduct that is said to have generated the illegal proceeds is without merit.

■ Defendants' second argument, *viz*, that the money laundering transactions charged do not involve the proceeds of unlawful activity, is also unavailing. It is premised on the faulty notion that the crime of mail fraud could not occur until the Town was paid by Grand Carting, (Defs.' Mem. at 35), whereas, in fact, the crime is complete upon the hatching of the scheme with the requisite intent supplemented by the use of the mails.

■ Defendants' final attack on the money laundering charges focuses on the claimed failure of the relevant racketeering acts to allege an effect on interstate or foreign commerce. (*Id.* at 39–40.) Initially, it is noted that all but one of the racketeering acts, as well as each of the substantive money laundering counts, refer to "financial transactions affecting interstate commerce." The one exception and, thus, the sole legitimate subject for defendants' argument, is Racketeering Act Two of Count One, which Racketeering Act is entitled "Money Laundering Conspira-cy." But as to that racketeering act, the unexplained absence of reference to interstate commerce is not fatal.

Racketeering Act Two cites Section 1956(a)(1). Included within that subsection is the term "financial transaction," 18 U.S.C. § 1956(a)(1), which is a term used (although in the plural) in the racketeering act. In subparagraph (c)(4) of Section 1956, a definition of that term is given, which includes an explanation that a subject transaction must "affect[ ] interstate or foreign commerce." 18 U.S.C. § 1956(c)(4). Under the circumstances, the absence of the phrase "affecting interstate commerce" in Racketeering Act Two does not render it subject to dismissal. *Cf. United States v. Wydermyer*, 51 F.3d 319, 325 (2d Cir.1995).

### Defendants' Motion to Strike Portions of the Indictment as Surplusage is Denied

■ Defendants have moved, pursuant to Rule 7(d) of the Federal Rules of Criminal Procedure, to strike the allegations of the Indictment relating to La Cosa Nostra ("LCN") upon the basis that such references are "inflammatory, unnecessary and prejudicial surplusage to the charges." (Defs.' Mem. at 80.) Before discussing the particular paragraphs involved, a brief review of the applicable law pertaining to such a motion is in order. For that purpose, the following excerpt from *United States v. Scarpa*, 913 F.2d 993 (2d Cir.1990), is instructive:

Motions to strike surplusage from an indictment will be granted only where the challenged allegations are "not relevant to the crime charged and are inflammatory and prejudicial." *United States v. Napolitano*, 552 F.Supp. 465, 480 (S.D.N.Y.1982) ... "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." *United States v. DePalma*, 461 F.Supp. 778, 797 (S.D.N.Y.1978). In RICO cases, courts have refused to strike allegations of organized crime connections that "serve to identify the 'enterprise' and the means by which its members and associates conduct

various criminal activities." *Napolitano*, 552 F.Supp. at 480.[5]

*Id.* 913 F.2d at 1013.

■ The Indictment in this case is 67 pages in length and has 144 numbered paragraphs and 60 counts. Defendants seek to strike as surplusage all 18 paragraphs from the introductory section of the accusatory instrument which refers to LCN,[6] including those which allege (1) that for "at least the past 20 years, the privately held companies . . . engaged in the collection and disposal of refuse in Nassau and Suffolk Counties . . . have been infiltrated and controlled by certain New York City-based LCN families," (Indictment ¶ 20), (2) that "[f]rom approximately 1979 until at least 1992 . . . the Colombo Crime Family [as part of LCN] . . . controlled certain carting companies on Long Island, including HICKEY'S CARTING, GRAND EAST, COMPETITION CARTING and GRAND CARTING," (*Id.* ¶ 26), (3) that Andrew Russo was a Captain in the Colombo Crime Family, (*Id.* ¶ 11), and (4) that "[t]he purpose of the Hickey Organization was to facilitate the control and domination by organized crime of the carting industry on Long Island and to make money for the Hickey Organization and the organized crime families serviced by the Hickey Organization," which "goal was accomplished by fraud, theft, threats of violence, acts of violence, and other crimes." (*Id.* ¶ 12.)

To provide context to the present dispute regarding the relevance of organized crime allegations in the Indictment, a brief overview of a portion of the Indictment is required.

On January 5, 1987, defendants Dennis C. Hickey and Hickey's Carting pled guilty to grand larceny in the second degree and conspiracy in the fifth degree in a then pending action in the Supreme Court of the State of New York, County of Suffolk. During the plea allocution, Dennis C. Hickey stated that he bribed employees of the Town of Islip landfill so that Hickey's Carting could dump waste at the town facility without paying the required fees. (Indictment ¶ 35.) Thereafter, the Town revoked the Solid Waste Permit of Hickey's Carting, thereby precluding that entity from continuing as a carter within the Township. (*Id.* ¶ 36.) The revocation, however, affected not only Dennis C. Hickey and Hickey's Carting, but also impacted on the financial interest of LCN.

The grand jury has charged that the Long Island Carting Industry is largely controlled by LCN. During the time period relevant for present purposes, LCN's members and associates were granted a vested right to service particular customers, known as "stops," which right was protected by LCN from any possible competition from other carters via, *inter alia*, threats of violence. (*Id.* ¶ 22.) In return, LCN shared in the proceeds realized from the activities of the participating carters. Moreover, LCN's activities in insulating its members and associates from competition permitted the "cartel members to charge inflated fees for carting services." (*Id.*)

Dennis C. Hickey is alleged to be an associate in the Colombo Crime Family, one of the organizations embraced within LCN, and a member of the "crew" of his co-defendant Andrew Russo. (*Id.* ¶ 3.) It is further charged that Dennis C. Hickey operated the Hickey Organization for the benefit of LCN, as well as for his own benefit and that of other Organization members. (*Id.*)

As noted, the revocation of Hickey's Carting's permit to conduct carting activities in the Town of Islip affected LCN. As a result, Andrew Russo met with his brother-in-law, Frank Carione, on or about November 13, 1987. (*Id.* ¶ 38.) Shortly thereafter, a scheme was developed whereby Grand Carting, operated by relatives of Frank Carione (to wit, defendants Joseph Carione and Angelo Carione), would apply for a permit from the Town of Islip to service the former customers of Hickey's Carting. (*Id.* ¶ 39.)

Grand Carting submitted an application in December of 1987, and received a Solid

---

**5.** *See also United States v. Hernandez*, 85 F.3d 1023, 1030 (2d Cir.1996); 1 Charles Alan Wright, *Federal Practice and Procedure* § 127 (2d ed.1982).

**6.** Defs.' Mem. at 80 n. 23.

Waste Permit in January of 1988. In its permit application, it indicated that it was leasing eleven trucks from Hickey's Carting in order to service the Islip customers. (*Id.* ¶¶ 40–42.)

Contrary to Grand Carting's representations in the permit applications, Grand East, a company allegedly owned and operated by Dennis C. Hickey and Maria Hickey, was actually servicing the prior customers of Hickey's Carting and being paid accordingly. (*Id.* ¶¶ 5, 6, 43.) In essence, the Hickey Organization used a Russo/LCN "front," Grand Carting, to continue its operations in Islip notwithstanding the 1987 permit revocation. This scheme was implemented through the various mail fraud and money laundering counts of the Indictment.

In seeking to have the allegations in the Indictment relating to LCN stricken, defendants proffer a number of propositions which are at odds with the allegations contained in the Indictment. By way of example, it is stated that "Russo's alleged role in this scheme is that he agreed to the plan." (Defs.' Mem. at 82.) The grand jury said he did more. In its view, he is the individual who arranged for Grand Carting to become the permit holder for the prior Hickey's Carting routes so that LCN's interest in those "stops" within Islip would remain under LCN's control. Similarly, the Court is told that "[t]he Indictment ... states that neither Russo nor the Colombo Family benefitted from the scheme." (*Id.*) That statement ignores such allegations in the Indictment as the one contained in paragraph 12 which identifies the "purpose" of the Hickey Organization as being to generate "money for

the Hickey Organization and the organized crime families serviced by the Hickey Organization." Indeed, contrary to the position urged by defendants, the grand jury has charged a significant interrelationship between the Hickey Organization and LCN. That interrelationship, including the efforts of Russo following the 1987 revocation of Hickey's Carting's permits, represents the milieu within which the Islip scheme and concomitant mail fraud and money laundering counts of the Indictment developed. In sum, defendants' claim that references to LCN in the Indictment are surplusage, subject to being stricken pursuant to Rule 7(d), lacks merit.[7]

*Defendants' Motion to Suppress Items Seized From Hickey's Carting, Grand Carting, 141 North Path Road, 70 Crane Neck Road, and Rite–Way Auto, Inc.*

1. *Basis for Motion to Suppress*

Defendants have moved to suppress the items seized during searches conducted at Hickey's Carting, Grand Carting, 141 North Path Road, 70 Crane Neck Road, and Rite–Way Auto, Inc. ("Rite–Way").[8]

Attached to the affidavit of Special Agent Donald W. McCormick, submitted in support of each of the search warrant applications, is a copy of the original Indictment.[9] For that reason, and as conceded by defendants, "it cannot fairly be disputed that the affidavit set[s] forth probable cause to believe that the defendants had committed the crimes with which they were charged." (Defs.' Mem. at 43.) However, each of the listed search warrants is said to be invalid in that: (1) "the affidavit in support of the warrant ... failed to establish probable cause to believe that

---

**7.** As noted earlier, *see supra,* at 24, relevant information may not be legitimately stricken from an indictment, irrespective of the prejudicial impact of that information on one or more of the defendants. However, at trial, the Court is permitted to balance relevancy under Rule 401 of the Federal Rules of Evidence with unfair prejudice and possible other countervailing considerations under Rule 403 in determining what information will be placed before the jury. Accordingly, the mere fact that the Indictment will stand, as returned by the grand jury, does not necessarily mean that every fact alleged by that body will ultimately become part of the trial record. By way of example, the mechanism by which an individual becomes a "made" mem-

ber of a crime family, (Indictment ¶ 18), and the purported "nationwide" scope of LCN, (*Id.* ¶ 17), might be found to be inadmissible following such a 401/403 balancing process.

**8.** The sixth location searched by the government *viz.,* an accountant's office at 330 Vanderbilt Motor Parkway, has not been included within defendants' motion to suppress.

**9.** For purpose of the Motion to Suppress portion of the opinion, references to the "Indictment" shall refer to the original indictment, that being the one, as noted above, which was attached to the McCormick affidavit and submitted to the magistrate judge.

evidence of criminal activity would be found at the particular premises sought to be searched" and (2) "each of the warrants was unconstitutionally vague and overbroad in that it did not describe with sufficient particularity the items to be seized." (*Id.* at 41.) In addition, defendants argue that the law enforcement officers who executed the warrants "flagrantly disregarded their terms, thereby transforming each of the searches into a general rummaging search." (*Id.*)

### 2. *The Warrants*

The format for each of the five warrants is the same, and consists of two pages. The first sheet, entitled "SEARCH WARRANT," provides a detailed description of the area to be searched, coupled with a reference to "ATTACHMENT 'A'" ("Attachment A").

Attachment A calls for the executing officers to search for, and to the extent successful, seize:

> All business records regarding any or all of the following corporate entities connected to DENNIS C. HICKEY, MARIA HICKEY, ANGELO CARIONE, JOSEPH CARIONE, DENNIS E. HICKEY, ANDREW RUSSO:
>
> > HICKEY'S CARTING, [I]NC.
> >
> > GRAND CARTING, INC.
> >
> > GRAND EAST, INC.
> >
> > COMPEPTITION [sic] CARTING, INC.
> >
> > including but not limited to:
>
> —Bank records of any kind, loan applications, original financial statements, corporate resolutions, contracts (municipal or private), permits, licenses, agreements, leases, performance and/or suretybonds [sic], account receivable journals, disbursement journals, ledgers, invoices, billing statements, customer invoices, payment records, payroll records, cash receipt records, credit card invoices or files, petty cash journals, tax records, tax work papers, computers, computer files, computer software, facsimile machine journals, telephone billing records, correspondence files, expense vouchers, business expense records, vehicle registration and title material, insurance documents, union documents, in-

cluding records of membership and payment, retirement fund records, pension benefit statements, health plan records, bid requests or proposals, municipal regulatory materials, Department of Environmental Control regulatory material, Environmental Protection Agency regulatory materials, deeds, real estate titles, property leases, real estate mortgage applications and mortgages, bank loans (commercial or private), safe deposit boxes, brokerage account records, [and] cash

(*See, e.g.,* Defs.' Mem.Ex. B.)

In addition, the warrants for the Hickey's Carting's offices, (*Id.* Ex. C), and for 70 Crane Neck Road, (*Id.* Ex. D), also authorize a search and seizure of "hand guns, rifles, shot guns, ammunition and explosive materials, including but not limited to hand grenades," and the warrants for 141 North Path Road, (*Id.* Ex. E), and Rite–Way, (*Id.* Ex. F), authorize a search and seizure of "hand guns" and "ammunition." As noted, each of the warrants was issued based upon the affidavit of Special Agent McCormick, sworn to on September 10, 1996. (*Id.* Ex. G.)

### 3. *Summary of Court's Decision Re Motion to Suppress; Discussion of Applicable Law*

For the reasons detailed below, (1) the affidavit of Special Agent McCormick provides probable cause to believe that evidence of the crimes charged described in the Indictment would be found at each of the searched premises, but (2) the search warrants for the business premises of Hickey's Carting, Grand Carting, and Rite–Way, and for the homes located at 70 Crane Neck Road and at 141 North Path Road, are violative of the Fourth Amendment's directive that a warrant "particularly describe[ ] . . . the . . . things to be seized," U.S. Const. amend. IV, *i.e.,* each suffers from overbreadth; moreover, as to each of these warrants, the warrants are not "severable" and the facial deficiency is so obvious that the seized items do not fall within the good faith reliance exception to the exclusionary rule enunciated in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

Before discussing defendants' multi-pronged motion to suppress, a brief overview of the applicable law is in order. To the extent additional authorities pertain solely to a particular aspect of defendants' argument, such citations will be provided when that issue or subject is reached.

■■■■ The Fourth Amendment provides that warrants may only issue upon a showing of "probable cause, supported by Oath or affirmation ... particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. A search warrant is properly predicated on probable cause when, under the "totality-of-the-circumstances," there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Moreover, the search warrant must delineate the specific area to be searched, as well as the particular items to be seized, with as much particularity as the circumstances reasonably permit. *See United States v. Wuagneux,* 683 F.2d 1343, 1349 (11th Cir.1982). The purpose of this limitation is to prevent "a general, exploratory rummaging in a person's belongings" by focusing the executing officer on the items that the magistrate judge has authorized him or her to seize at a designated location. *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

■■■■ Finally, in considering an attack on a search warrant, "great deference" should be afforded to a probable cause determination made by the magistrate judge. *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 591, 21 L.Ed.2d 637 (1969). That deference, however, is obviously "not boundless." *Leon,* 468 U.S. at 914, 104 S.Ct. at 3416. Indeed, as noted in *Leon:*

> Even if the warrant application was supported by more than a "bare bones" affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circum-

stances, or because the form of the warrant was improper in some respect.

*Id.* 468 U.S. at 915, 104 S.Ct. at 3416–17 (citation omitted).

4. *Probable Cause to Believe Items Sought Would Be Found at Designated Search Locations*

■■■■ With these general principles in mind, attention is now directed to the arguments raised by defendants, beginning with the claim that the McCormick affidavit fails to provide probable cause to believe that the items sought were likely to be found at the designated search locations. Initially, it should be noted that the presence or absence of probable cause is to be determined in a common sense fashion. *See Gates,* 462 U.S. at 228, 103 S.Ct. at 2332; *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983). So viewed, the affidavit here clearly passes muster. Indeed, a consideration of the information in that affidavit—including the allegations in the Indictment, which was attached and incorporated by reference in the affidavit,—provided more than an adequate basis to conclude that evidence of the crimes with which defendants stand accused would be found at the various locations.

Among the items of information gathered during the government's four-year investigation were detailed descriptions of the activities of the businesses associated with the Hickey Organization, including the nature and location of the records maintained by those businesses. The sources for this information included a number of former employees of Hickey's Carting.

In sum, the materials submitted to the magistrate judge were sufficient to establish probable cause to believe that evidence of the scheme delineated in the Indictment would be found at each of the locations subject to the challenged warrants.

5. *Warrants Unconstitutionally Overbroad*

■■■ The second issue raised by defendants targets the broad language used in the warrants, beginning with the introductory paragraph which authorized the seizure of

"*[a]ll* business records regarding any or all of the following [defendant] corporate entities ... *including but not limited to: —*Bank records of any kind" and a host of other items, many generic in character. (*See, e.g.,* Defs.' Mem.Ex. C (emphasis supplied).) In defendants' view, the use of such all-encompassing language is violative of the Fourth Amendment because it invites a general search, the parameters of which are drawn largely through the unfettered discretion of the executing officers. Defendants further complain that the warrant is without temporal limitations.

(a) *Absence of Time Frame*

Proceeding in reverse order, there are no time constraints within the warrants. As the government notes, the affidavit identifies the period of criminality, (Gov't's Resp. at 59), as does the Indictment. Yet, neither of these documents accompanied the warrants given to the executing officers, thereby rendering this point by the government irrelevant. *See United States v. George,* 975 F.2d 72, 76 (2d Cir.1992) ("A sufficiently specific affidavit will not itself cure an overbroad warrant. Resort to an affidavit to remedy a warrant's lack of particularity is only available when it is incorporated by reference in the warrant itself and attached to it.") (citation omitted). Clearly, the warrants, being devoid of a time limitation, authorized searches for documents that both pre-date and post-date the periods of charged criminality. This void supports defendants' overbreadth argument. *Cf. United States v. Abrams,* 615 F.2d 541, 545 (1st Cir.1980) ("A time frame should ... have been incorporated into the warrant."); *United States v. Kow,* 58 F.3d 423, 427 (9th Cir.1995); *Roberts v. United States,* 656 F.Supp. 929, 935 (S.D.N.Y.1987), *rev'd on other grounds,* 852 F.2d 671 (2d Cir.1988).

(b) *Absence of Degree of Particularity Required by Fourth Amendment*

i. *Breadth of Warrants*

The warrants do not appropriately specify the documents to be seized. In endeavoring

to justify its actions, the government begins by erroneously identifying the focus of defendants' lack of specificity argument as the McCormick "affidavit," (Gov't's Resp. at 58), rather than the warrants which were actually targeted, followed by the assertion that the "all records" exception—to be discussed momentarily—is applicable to all of the searches "especially Hickey's Carting, Inc. and Grand Carting, Inc." (*Id.* at 59, 61–62 (citing *National City Trading Corp. v. United States,* 635 F.2d 1020 (2d Cir.1980); *United States v. Brien,* 617 F.2d 299, 309 (1st Cir.1980); *Andresen [sic] v. State of Maryland,* 427 U.S. 463, 481 n. 10, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *United States v. Johnson,* 886 F.Supp. 1057 (W.D.N.Y.1995) [,*aff'd,* 108 F.3d 1370 (2d Cir.1997) (summary order) ]; *United States v. Paccione,* 738 F.Supp. 691 (S.D.N.Y.1990)).)

The government's argument continues with the observation that the Fourth Amendment is not compromised "because the officers executing the warrant must exercise some minimal judgement [sic] whether a particular document falls within [a] described category," (Gov't's Resp. at 60 (citing *United States v. Riley,* 906 F.2d 841, 845 (2d Cir. 1990))), and that the degree of specificity required of a warrant depends on the circumstances. (*See* Gov't's Resp. at 60–61 (citing *Wuagneux,* 683 F.2d at 1349).)

As noted, all of the challenged warrants are virtually the same, with the only significant variant being the places to be searched. Common to all five is the absence of meaningful parameters to guide the executing officers. As also previously mentioned, none of the warrants limited the search to documents generated within a particular time frame. And none identified the nature of the suspected wrongdoing triggering the searches. *See Kow,* 58 F.3d at 427 ("We have criticized repeatedly the failure to describe in a warrant the specific criminal activity suspected."); *cf. Andresen,* 427 U.S. at 480–81, 96 S.Ct. at 2748–49; *Roberts,* 656 F.Supp. at 935. Additionally, no copy of the McCormick affidavit or Indictment was attached to the warrants [10] to provide context to what the

---

**10.** The government's assertion that the warrant "incorporated the original Indictment," (Gov't's

Resp. at 65), is erroneous, as thereafter con-

officers had been called upon to do, *see George*, 975 F.2d at 76; *United States v. Maxwell*, 920 F.2d 1028, 1031–33 (D.C.Cir. 1990); *cf. United States v. Gigante*, 979 F.Supp. 959, 967 (S.D.N.Y.1997), nor was any reference made to the allegedly violated statutory sections to provide some type of parameters for the searches. *Cf. George*, 975 F.2d at 76 ("Nothing on the face of the warrant tells the searching officer for what crimes the search is being undertaken."); *United States v. Leary*, 846 F.2d 592, 601–02 (10th Cir.1988). Instead, the officers were simply furnished with warrants that directed the seizure of "all business records" of the four corporate defendants found at any one of the five search locations, absent any explicit or implicit reference points. That direction is followed by a list of items subject to seizure, many generic (*e.g.*, "[b]ank records of any kind," "corporate resolutions," "ledgers," "invoices," "computer files," "computer software," and "correspondence files"), preceded by the troubling instruction that the searches were "not limited to" those items. (*See, e.g.*, Defs.' Mem.Ex. C.) In essence,—given the format of the warrants— the officers were directed to search all of the business records of each of the defendant corporations and to seize any items that constituted evidence of *any* crime regardless of its nature or when it occurred. Prescinding for the moment from a discussion of the "all records" exception, such unstructured mandates were clearly violative of the Fourth Amendment. *See, e.g.*, *Kow*, 58 F.3d at 427; *George*, 975 F.2d at 75–76; *United States v. Buck*, 813 F.2d 588, 590–92 (2d Cir.1987); *United States v. Cardwell*, 680 F.2d 75, 77–79 (9th Cir.1982); *Roberts*, 656 F.Supp. at 931.

### ii. *Warrants Not Salvageable Under "All Records" Exception*

Before discussing the government's effort to legitimize the warrants under the "all records" exception, a brief explanation of the principle is in order.

■ Under that exception, all records of a business may be seized if there is probable cause to believe that the entire operation is permeated with fraud. *See National City*

*Trading Corp.*, 635 F.2d at 1026 ("[W]e begin ... by ... noting that there was probable cause to believe that NCTC's business was permeated with fraud. Accordingly, the agents could properly seize all of the business records of NCTC described in the warrant."); *United States v. Burke*, 718 F.Supp. 1130, 1139 (S.D.N.Y.1989) ("When there is probable cause to believe that a business is pervaded with fraud, seizure of all records is appropriate and, thus, a broad warrant would pass constitutional scrutiny."); *Roberts*, 656 F.Supp. at 936 (noting that for the "all records" exception to apply, there must be probable cause to believe that "the target enterprises conducted no legitimate activities at all, and every action they took at every stage [of their operations] was designed only to further their fraudulent objectives.").

The principle is not so much an "exception" to the particularity requirement of the Fourth Amendment as a recognition that a warrant—no matter how broad—is, nonetheless, legitimate if its scope does not exceed the probable cause upon which it is based. The more extensive the probable wrongdoing, the greater the permissible breadth of the warrant.

■ To determine whether the five search warrants here fall within the "all records exception," reference must be made to the materials furnished to the magistrate judge, *viz.*, the McCormick affidavit, and the original Indictment attached to the affidavit.

Paragraph 3, the relevant portion of the affidavit, was quoted earlier. To partially reiterate, it speaks of one overriding scheme, the Islip fraud. Elsewhere in the affidavit, information is provided about Dennis C. Hickey's possession of various firearms and their locations. In essence, those two subjects—the Islip fraud, and illegal possession of firearms—represents the extent of the suspected criminality portrayed by Agent McCormick in his affidavit.

Although the Indictment attached to the affidavit begins with the aforementioned allegations that private carters on Long Island are owned and controlled by LCN, including the four corporate defendants, those asser-

firmed by the government via letter dated July 22, 1998, following the Court's inquiry.

tions are not converted into charges or racketeering acts in the original Indictment except with respect to the Islip fraud. Thus, *e.g.*, in identifying the activities of the Hickey Organization it explains that its "members and associates engaged in mail fraud, bribery and money laundering," *i.e.*, the three substantive and racketeering acts embodied in that scheme. (Gov't's Resp. Ex. E. ¶ 1.)

In sum, the core criminality here [11]—for purposes of determining the parameters of the probable cause placed before the magistrate judge and applicability of the "all records" exceptions to the five warrants—is the Islip fraud. The government does not contend otherwise. Rather, it argues that the exception applies because "the [.] corporations, especially Hickey's Carting, Inc. and Grand Carting, Inc. were so permeated by the fraudulent scheme in this case [*i.e.*, the Islip fraud] that the business themselves existed in order to maintain the organized crime domination of the carting industry on Long Island." (Gov't's Resp. at 59.) The government's effort to legitimize the warrants under the "all records" exception is unpersuasive. The Fourth Amendment requires more than mere extrapolation to activate the principle. It may be that the crimes associated with the Islip fraud are representative of the other activities of the defendant corporations, but perhaps not. A perusal of the information before the magistrate judge—and, indeed, the information available now—is simply too scant to permit such a determination.

Although there is a dearth of relevant information, we do know from post-indictment, pre-trial proceedings that Hickey's Carting had significant operations outside of the Town of Islip both before and during the Islip fraud. Additionally, it appears that Grand Carting engaged in other activities beyond serving as a "front" for the Hickey Organization during the subject time frame. Were these other operations of the defendant corporations similarly corrupted? Given the limited information provided to the magis-

trate judge, this pivotal question is unanswerable.

But even if, *arguendo*, the exception was found to be applicable here, that circumstance would not serve to obliterate the Fourth Amendment concerns including the requirement that the warrants be as particular as reasonably possible under the circumstances. These warrants—as will be more fully addressed in the next subdivision of this opinion—wholly fail to meet that standard, beginning with the lack of a time period even though the government knew that the Islip fraud did not commence until 1987.

In sum, there was insufficient information presented to the magistrate judge to permit a determination of whether all of the business activities of Hickey's Carting, Grand East, Competition Carting, and Grand Carting—either under a "tip of the iceberg" analysis, *United States v. Johnson*, 886 F.Supp. 1057, 1072 (W.D.N.Y.1995), *aff'd*, 108 F.3d 1370 (2d Cir.1997) (summary order), or otherwise—were permeated with fraud. As a result, the "all records" exception is found to be inapplicable to the five challenged warrants.

### iii. *Greater Specificity as to Targets of Search and Seizure was Required*

In *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), the Court explained the purpose underlying the Fourth Amendment's particularity requirement thusly:

> The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.

*Id.* 275 U.S. at 196, 48 S.Ct. at 76.

However, as noted in *United States v. Young*, 745 F.2d 733 (2d Cir.1984), the above

---

**11.** The original Indictment contained a number of incidental charges against various defendants including, *inter alia*, mail fraud counts based on bogus insurance claims for two garbage trucks, and ERISA violations charged against Dennis C.

Hickey and Hickey's Carting. None of these other charges, however, are sufficiently germane to be factored into the present discussion of the "all records" exception.

"passage from *Marron* has not always been applied literally," and

> [c]ourts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant.

*Id.* 745 F.2d at 759.

Nonetheless, "a failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment because there is no assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary." *George,* 975 F.2d at 76.

The government maintains that (1) "the warrant[s] particularized the records at Hickey's Carting, Inc., Grand Carting, Inc. and Rite–[W]ay Auto, Inc.," (Gov't's Resp. at 64), but that, in any event, (2) the warrants were as specific as the circumstances reasonably permitted, thus falling within the explanation provided in *Young* that *Marron,* as applied over the years, recognizes practical considerations.

The initial position is belied by a simple reading of the warrants. The only limitation is that the items seized be a business record. Within that category, any evidence of any crime was to be seized. The language "connected to" in the introduction portion of the warrants, (*see supra,* at 30), merely serves to further describe the four corporations, rather than circumscribe the scope of the searches.

The "all business records" and "not limited to" terminology resembles—in effect, though not literally—the offending language in *George.* There, following a robbery, police officers obtained a highly detailed warrant listing the items taken, but which concluded by calling for the seizure of "any other evidence relating to the commission of a crime." 975 F.2d at 74. Similarly here, the direction given to the executing officers was not limited to items within the ambit of probable cause; instead, evidence uncovered in the business records of *any* crime was to be seized.

In *George,* the government unsuccessfully argued that the challenged phrase did not offend the particularity requirement when read in context, the proffered "context" being the specific listing to which it was appended. That argument, based on *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), is not even available to the government here, given that the troublesome language precedes, rather than follows, the more specific itemization. The phrases expand, not narrow, the reach of the warrants. And, also unlike in *George* and *Andresen,* many of the terms in the accompanying list are largely generic instead of appropriately dovetailed to the crimes under investigation. Clearly, the warrants did not sufficiently particularize in any meaningful fashion the items sought, either at the homes searched, or at the business locations.

Under the circumstances, however, could the government have done more? Surely, greater specificity could have been added to the warrants by simply including the time frame from the then existing Indictment. And there was no impediment to providing some type of guidance to the officers as to what they were looking for by, *e.g.,* attaching a copy of the affidavit and Indictment.

To the extent the government's defense of the warrants focuses on the nature of the criminal relationship among the defendant corporations, rather than the tenuous assertion that the warrants were particularized, its argument has more substance. A major focus of the investigation was the purported money laundering by defendants of the proceeds realized from the Islip fraud.

Money laundering is intended to defy detection and may take many forms. Often a broad-based warrant is required by the very nature of the crime. But, here, both the purpose, and likely concomitant parameters, of the money laundering scheme were known when the warrants were sought. The purpose was simply to prevent detection of the fact that "business continued as usual" following revocation of Hickey's Carting's Solid Waste Disposal permits in 1987, but for different signs being placed on Hickey's Cart-

ing's trucks; the method used was a series of money transfers among the four corporate defendants and, in some instances, transfers involving the Town of Islip. Indeed, the nature of the money laundering transfers are detailed in both the original Indictment and the present accusatory instrument, as synopsized in the captions to the money laundering counts and racketeering acts.

The money laundering scheme was narrow, consistent with its known purpose. Such being the case, the scope of the warrants [12] may not be justified based on the fact that the Indictment includes charges of money laundering.

### iv. *Conclusion Re Overbreadth Issue*

To determine whether a warrant complies with the particularity requirements of the Fourth Amendment, the warrant's breadth and specificity must be examined. Those two interrelated concepts have been addressed, and the warrants fall short of the mark for the reasons indicated.

The cases cited by the government do not warrant a different result. The defendants in *National City Trading Corporation v. United States*, 635 F.2d 1020 (2d Cir.1980), and *United States v. Brien*, 617 F.2d 299 (1st Cir.1980), were classic candidates for the application of the "all records" exception. Each was a one-dimensional "boiler room" operation marketing a single scam. Neither—as noted by Judge Sweet in *Roberts v. United States*, 656 F.Supp. at 936,—"conducted [any] legitimate activities at all, and every action they took at every stage was designed solely to further their fraudulent objectives." As noted, there was insufficient information before the magistrate judge to permit the same categorization to be made of the four defendant corporations in the present case.

In *United States v. Johnson*, 886 F.Supp. 1057 (W.D.N.Y.1995), *aff'd*, 108 F.3d 1370 (2d Cir.1997) (summary order), the lower court concluded that four interconnected corporations engaged in the disposal of hazardous waste—all operating out of the same suite of offices—were fair targets for broad-based warrants under the "all records" exception. This conclusion was based on a finding of probable cause to believe that the illegal disposing of hazardous waste permeated their business activities.

The text of the warrants in *Johnson* are not reproduced in the lower court opinion, or in the Circuit Court's affirmance of that court's judgment by summary order. What may be gleaned from the opinions, however, is that the items listed were generally more specific to the crimes charged than here, including such items as "waste product records" and "waste receiving reports." *Id.* 886 F.Supp. at 1071. Moreover, in *Johnson*, the broad call for the seizure of all of the books and records of the four corporations had a temporal component, *see id.* 886 F.Supp. at 1072, and, in the view of Magistrate Judge Foschio, was circumscribed by the principle that "[i]n reviewing a warrant against a claimed lack of particularity, 'the language of a warrant is to be construed in light of an illustrative list of seizable items.' " *Id.* 886 F.Supp. at 1071 (quoting *United States v. Riley*, 906 F.2d 841, 844 (2d Cir.1990)). Moreover, in considering the value of *Johnson* and other search warrant decisions for present purposes, it must be remembered that the "all records" exception, and considerations of specificity, are "fact specific." To that extent, each case is quasi-*sui generis*.

The last of the government's cited decisions that will be discussed is *United States v. Paccione*, 738 F.Supp. 691 (S.D.N.Y.1990), a case involving defendants' operation of an illegal landfill. Again, the full text of the

---

**12.** Representative of the impermissible breadth of the warrants is also seen in the direction to the executing officers to search for "insurance documents." That direction presumably pertains to Counts Twenty–Three through Twenty–Six which charge Dennis C. Hickey, Hickey's Carting, and William Grainger (as to some of the counts) with submitting bogus or inflated claims to the Empire Insurance Group regarding supposed damage to two trucks. Possibly the "in-surance documents" sought might also pertain to ERISA violations charged in Counts Twenty–Seven through Twenty–Nine. In any event, rather than seeking only those insurance documents consistent with the existing probable cause, the government simply demanded the seizure of all "insurance documents," which would include information about life insurance policies and other irrelevant subjects, for future perusal.

warrants is not set forth in the district court opinion, although the portion that is set forth, *see id.* 738 F.Supp. at 707, is substantially similar to those presently under discussion. However, the opinion is silent as to whether the warrants had time constraints, or other parameters, to guide the executing officers during their searches, thus limiting the significance for present purposes of *Paccione.* It is noted, however, that in *Paccione,* as well as *Johnson,* the "all records" exception was found to be applicable, a circumstance not present here.

In sum, the Court has carefully considered the government's defense of the warrants and reviewed all authorities cited, some of which have been mentioned above. Based on the facts of this case, the Court concludes that each of the five warrants violates the particularity requirement of the Fourth Amendment.

### 6. *The Warrants are not Severable*

■■■ The constitutional defects taint each of the five warrants *in toto. See, e.g., Kow,* 58 F.3d at 428; *Cardwell,* 680 F.2d at 78 ("If no portion of the warrant is sufficiently particularized to pass constitutional muster, then total suppression is required ... otherwise the abuses of a general warrant would not be prevented."); *see generally,* 2 Wayne R. La-Fave, *Search & Seizure* § 4.6(f) (3d ed.1996). All, and every part of each warrant, were fashioned without time constraints or other guidelines to circumscribe the searches conducted by the executing officers.

These warrants are general in nature and the invalidity permeates the warrants. Such being the case, severance is not possible.

### 7. *Good Faith Exception to the Exclusionary Rule Not Applicable*

■■■ The good faith exception to the exclusionary rule, as articulated in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), is inapplicable because the warrants were "so facially deficient ... in failing to particularize ... the things to be seized [,] that the executing officers [could not] reasonably presume [them] to be valid." *Id.* 468 U.S. at 923, 104 S.Ct. at 3421.

### 8. *Conclusion Re Motion to Suppress Evidence Seized at Five of the Six Search Locations*

For the reasons indicated, the defendants' motion to suppress is granted. By way of a partial synopsis, the extent of the probable cause presented to the magistrate judge embraced the Islip fraud, together with information pertaining to the ERISA violations and the other incidental crimes previously mentioned. As a result, the warrants could have been drafted with sufficient scope to permit searches for the concomitant fruits, instrumentalities, and other evidence of those crimes, including evidence of the Russo/LCN genesis for the scheme in Islip. But instead, warrants—wholly devoid of restrictions, or guidelines for the executing officers—were issued, thereby transgressing the "line between the comprehensiveness necessary to effective law enforcement and a failure of particularity which permits law officers to engage in a 'general, exploratory rummaging in a person's belongings.' " *In re the Search of Kitty's East,* 905 F.2d 1367, 1374 (10th Cir.1990) (quoting *Coolidge,* 403 U.S. at 467, 91 S.Ct. 2022). Indeed, if the government's position were accepted, it would be difficult to envision a warrant that would be violative of this requirement of the Fourth Amendment.

### *Demand for Bill of Particulars*

Defendants have moved, pursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, for an order directing the government to furnish a bill of particulars. The items demanded are set forth in a 18–page letter dated August 21, 1997, containing 167 requests, some of which are multifaceted. (*See* Defs.' Mem.Ex. I.)

The main thrust of the government's letter response dated October 14, 1997, (*see id.* Ex. J), is that no further specificity need be furnished, coupled with an explanation concerning a number of the requests as to precisely where the items sought may be found in the Indictment.

■■■ The purpose of a bill of particulars is to permit a defendant "to identify with sufficient particularity the nature of the

charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987). The Second Circuit has explained that "[g]enerally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Id.* Accordingly, a bill of particulars "should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Torres,* 901 F.2d 205, 234 (2d Cir.1990). "It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice of the charges against him, the government is not required to disclose additional details about its case." *United States v. Payden,* 613 F.Supp. 800, 816 (S.D.N.Y.1985). And finally, "[t]hese principles [governing requests for bills of particulars] must be applied with some care when the Government charges criminal offenses under statutes as broad as RICO." *United States v. Davidoff,* 845 F.2d 1151, 1154 (2d Cir.1988).

The Indictment in this case is highly detailed, and extensive discovery has been provided. Further specificity via a bill of particulars is not required except as follows:

1. with respect to the "others," mentioned in certain counts and racketeering acts, who allegedly participated in charged wrongdoing, the government shall indicate whether a defendant (as distinct from an unindicted individual) is one of the "others" referred to and, if so, identify the defendant as to each count and racketeering act;

2. with respect to substantive criminal acts alleged in certain counts and racketeering acts to have occurred "within the Eastern District of New York *and elsewhere*" (emphasis added), the government shall furnish to the defense the general location (by county, borough, or like geographical designation) where such substantive criminal violations occurred if outside the Eastern District of New York; and

3. with respect to fraudulent insurance claims alleged in certain counts and racketeering acts, the government shall indicate whether the named defendants are being called upon to answer a scheme to inflate legitimate claims or a scheme to create wholly fictitious claims.

The government shall furnish the information called for above on or before August 14, 1998. In all other respects, defendants' demand for a bill of particulars is denied.

*Motion for List of Government Witnesses*

The defendants have failed to articulate a legitimate basis for the Court to direct the government to furnish them with a witness list at this time.

Accordingly, that application by the defense is denied.

## CONCLUSION

The motions [13] of defendants are denied except:

1. their motion to suppress items seized at Hickey's Carting, Grand Carting, 141 North Path Road, 70 Crane Neck Road, and Rite–Way, is granted; and

2. their motion for a bill of particulars is granted in part and denied in part.

SO ORDERED.

---

**13.** As noted, some of the items of relief sought by defendants in the present motions have previously been resolved by the Court.